JS 44  (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ALLIANCE LIFE SCIENCES CONSULTING GROUP, INC., | LASZLO FABRICZI AND QUINTILES IMS (f/k/a IMS Health), |

**(b)** County of Residence of First Listed Plaintiff   Somerset County, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Somerset County, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jacobs Law Group P.C., 2005 Market Street, Suite 1120, Philadelphia, PA 19107, Tel: 215-569-9701 AND Grey Street Legal, LLC, 356 N. Pottstown Pike, Suite 200, Exton, PA 19341, Tel: 610-594-4737

Attorneys *(If Known)*
Duane Morris LLP, 30 S 17th Street, Philadelphia, PA 19103-4196, Tel: 215.979.1000; AND McShea Law Firm, P.C., 1500 Market St., Suite 4000 W, Philadelphia, PA 19102, Tel: 215-599-0800

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1  Original Proceeding
☒ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation - Transfer
☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Federal Defend Trade Secrets Act, 18 U.S.C. § 1836
Brief description of cause:
Plaintiff alleges that Defendants and Plaintiff's former employees unlawfully compete with Plaintiff.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/23/2017 | /s/ Lawrence H. Pockers |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: c/o Jacobs Law Group P.C. (Richard E. Miller, Esq. and Samuel M. First, Esq.), 2005 Market Street, Suite 1120, Philadelphia, PA 19107

Address of Defendant: c/o Duane Morris LLP (Lawrence H. Pockers, Esq.), 30 S 17th Street, Philadelphia, PA 19103-4196; McShea Law Firm, P.C. (John P. McShea, Esq.), 1500 Market St., Suite 4000 W, Philadelphia, PA 19102

Place of Accident, Incident or Transaction: _____State action was filed in the Court of Common Pleas of Philadelphia County_____
(*Use Reverse Side For Additional Space*)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes ☒  No ☐
Quintiles IMS Holdings, Inc.

Does this case involve multidistrict litigation possibilities?          Yes ☐  No ☒
*RELATED CASE, IF ANY*:
Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
          Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
          Yes ☐  No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
          Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
          Yes ☐  No ☒

---

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases*:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
(Please specify) _Federal Defend Trade Secrets Act, 18 U.S.C. § 1836_

B. *Diversity Jurisdiction Cases*:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

---

### ARBITRATION CERTIFICATION
(*Check Appropriate Category*)

I, Lawrence H. Pockers _____, counsel of record do hereby certify:
☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☒ Relief other than monetary damages is sought.

DATE: February 23, 2017          /s/ Lawrence H. Pockers          84589
                              Attorney-at-Law                  Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: February 23, 2017          /s/ Lawrence H. Pockers          84589
                              Attorney-at-Law                  Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| ALLIANCE LIFE SCIENCES CONSUL TING GROUP, INC., | : | CIVIL ACTION |
| v. | : | |
| LASZLO FABRICZI AND QUINTILES IMS (F/K/A IMS HEALTH), | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.   ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.   ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)   ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   (X)

| | | |
|---|---|---|
| February 23, 2017 | /s/ _Lawrence H. Pockers_ | Quintiles IMS Incorporated f/k/a IMS Health Incorporated |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215.979.1153 | 215.689.3761 | LHPockers@duanemorris.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

### Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)         The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)         In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)         The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)         Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)         Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

### SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLIANCE LIFE SCIENCES CONSULTING GROUP, INC., 265 Davidson Avenue, Suite 310, Somerset, NJ 08873 | : : : : : |
| Plaintiff, | : : |
| v. | : : : |
| LASZLO FABRICZI, 221 Johns Lane Neshamic Station, NJ 08853 | : : : : |
| and | : : |
| QUINTILES IMS (f/k/a IMS Health), One IMS Drive Plymouth Meeting, PA 19462 | : : : : : |
| Defendants. | : |

## NOTICE OF REMOVAL

**TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA AND TO PLAINTIFF:**

PLEASE TAKE NOTICE that Defendant Quintiles IMS Incorporated f/k/a IMS Health Incorporated (incorrectly pleaded as Quintiles IMS f/k/a IMS Health, and hereinafter referred to as "QuintilesIMS"), by and through its undersigned counsel, Duane Morris LLP, hereby files its Notice of Removal under 28 U.S.C. §§ 1331, 1441 and 1446, to effect removal of this matter which was commenced in the Court of Common Pleas of Philadelphia County, Pennsylvania, and designated Case No. 03536, February Term 2017 (the "State Court Action"). QuintilesIMS states that removal is proper for the following reasons:

## I. PROCEDURAL HISTORY

1. On or about February 15, 2017, Plaintiff Alliance Life Sciences Consulting Group, Inc. ("Plaintiff") filed a Complaint in the Court of Common Pleas of Philadelphia County asserting five common law and state law causes of action and one claim based on a purported violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

2. In addition to Laszlo J. Fabriczi, the Complaint inaccurately identifies Quintiles IMS f/k/a IMS Health as a defendant. The proper corporate defendant, however, is Quintiles IMS Holding, Inc.

3. The cornerstone of the lawsuit is Plaintiff's allegation that Defendants Fabriczi and QuintilesIMS are engaged in unlawful competition with Plaintiff. The Complaint contends that QuintilesIMS hired Plaintiff's former employees, and caused them to breach the restrictive covenants in their employment agreements, in order to access Plaintiff's confidential information and goodwill. Plaintiff further asserts that QuintilesIMS is using the confidential information and goodwill to interfere with Plaintiff's relationships with current and prospective clients. In accordance with 28 U.S.C. § 1446(a), attached hereto as **Exhibit A** is a true and correct copy of the Complaint.

4. In conjunction with the Complaint, Plaintiff filed a Petition for a Preliminary Injunction, as well as its Memorandum of Law in Support of its Petition. A true and correct copy of those filings is attached hereto as **Exhibit B**.

5. Plaintiff also filed a Motion for Expedited Discovery pursuant to Pennsylvania Rule of Civil Procedure 4007.3. A true and correct copy of that filing is attached hereto as **Exhibit C**.

## II.  REMOVAL

6.     Defendants QuintilesIMS and Mr. Fabriczi, through their counsel, received copies of the Complaint and the ancillary filings on February 16, 2017.  On February 17, 2017, Defendants accepted service of the Complaint and the ancillary filings.  A copy of the February 17, 2017 email from Lawrence H. Pockers to Plaintiff's counsel, accepting service on behalf of the Defendants, is attached hereto as **Exhibit D**.  Mr. Fabriczi is now being represented by John McShea, Esquire, of the McShea Law Firm.

7.     Pursuant to 28 U.S.C. § 1446(b), QuintilesIMS timely files this Notice of Removal within 30 days of the earliest date that Defendant received the Complaint.

8.     A civil action filed in state court may be removed, pursuant to 28 U.S.C. § 1446, to the United States District Court for the district and division where such action is pending if the district court has original jurisdiction over the action.  28 U.S.C. § 1441(a).

9.     Here, it is indisputable that this Court has original jurisdiction under 28 U.S.C. § 1331 because the action arises under the laws of the United States.  Specifically, the Complaint alleges that QuintilesIMS has been misappropriating Plaintiff's confidential information and trade secrets without authorization and in direct violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836.  The presence of the claim under the Federal Defend Trade Secrets Act is sufficient to warrant removal under 28 U.S.C. § 1441(a) and (c).  *See, e.g., Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9-12 (1983) (stating that removal is appropriate when a federal question is presented on the face of the plaintiff's complaint).

10.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United

States Constitution." 28 U.S.C. § 1367; *see also HB General Corp. v. Manchester Partners*, 95 F.3d 1185, 1191 (3d Cir. 1996) (affirming that the district court had supplemental jurisdiction over claims for which it lacked an independent basis for jurisdiction because those claims formed part of the same case or controversy as a claim over which the district court had original jurisdiction); *Jarzyna v. Home Properties, L.P.*, 763 F. Supp. 2d 742, 753 (E.D. Pa. 2011) (holding that because all claims "arise out of the same common nucleus of facts," the district court would exercise supplemental jurisdiction over state law claims that were related to the federal law causes of action).

11.     The United States District Court for the Eastern District of Pennsylvania is the proper venue to which this action may be removed, pursuant to 28 U.S.C. § 1441(a), because the Court of Common Pleas of Philadelphia County, Pennsylvania, where Plaintiff commenced this action, is located in the Eastern District of Pennsylvania.

12.     A copy of this Notice of Removal will be filed in the office of the Prothonotary of the Court of Common Pleas of Philadelphia County, pursuant to 28 U.S.C. § 1446(d).

13.     In addition, QuintilesIMS will give written notice of this removal to Plaintiff and co-Defendant through their respective counsel of record.

14.     In filing this Notice of Removal, Defendant does not waive, and specifically reserves, any and all objections as to service, personal jurisdiction, defenses, exceptions, rights, and motions. No statement herein or omission shall be deemed to constitute an admission by Defendants of any of the allegations of, or damages sought in, the Complaint.

15.     QuintilesIMS further reserves the right to amend or supplement this Notice of Removal.

WHEREFORE, QuintilesIMS, pursuant to 28 U.S.C. §§ 1331, 1367, 1441 and 1446, hereby removes this civil action from the Court of Common Pleas of Philadelphia County, Pennsylvania to the United States District Court for the Eastern District of Pennsylvania.

Dated: Philadelphia, Pennsylvania
February 23, 2017

**DUANE MORRIS LLP**

/s/  *Lawrence H. Pockers*
Lawrence H. Pockers (#84589)
Oderah C. Nwaeze (#317991)
30 South 17th Street
Philadelphia, PA 19103-4196
Tel.: 215.979.1000
Fax: 215.979.1020

*Counsel for Defendant Quintiles IMS
Incorporated f/k/a IMS Health Incorporated*

5

## CERTIFICATE OF SERVICE

I, Lawrence H. Pockers, hereby certify that on the 23rd day of February 2017, a true and

correct copy of Defendant's Notice of Removal was served, via regular first class mail on all

parties or their counsel of record.

Richard E. Miller (#46451)
Samuel M. First (#66176)
**Jacobs Law Group, PC**
2005 Market Street, Suite 1120
Philadelphia, PA 19107

Janeen Olsen Dougherty (#65883)
**GREY STREET LEGAL, LLC**
356 N. Pottstown Pike, Suite 200
Exton, Pennsylvania 19341

*Counsel for Plaintiff*

John P. McShea (#34562)
**McShea Law Firm, P.C.**
1500 Market St., Suite 4000 W
Philadelphia, PA 19102

*Counsel for Laszlo Fabriczi*

*/s/  Lawrence H. Pockers*
Lawrence H. Pockers (#84589)

6

**EXHIBIT A**

JACOBS LAW GROUP, PC
Richard E. Miller (I.D. No. 46451)
Samuel M. First (I.D. No. 66176)
2005 Market Street, Suite 1120
Philadelphia, PA  19107
215-569-9701

Of Counsel:

GREY STREET LEGAL, LLC
Janeen Olsen Dougherty (I.D. No. 65883)
356 N. Pottstown Pike, Suite 200
Exton, Pennsylvania 19341
(610) 594-4737
Attorneys for Plaintiff

| | |
|---|---|
| ALLIANCE LIFE SCIENCES<br>CONSULTING GROUP, INC.,<br>    265 Davidson Avenue, Suite 310,<br>    Somerset, NJ 08873<br><br>                Plaintiff<br><br>        v.<br><br>LASZLO FABRICZI,<br>    221 Johns Lane<br>    Neshamic Station, NJ 08853<br><br>       and<br><br>QUINTILES IMS (f/k/a IMS Health),<br>    One IMS Drive<br>    Plymouth Meeting, PA 19462<br><br>                Defendants. | COURT OF COMMON PLEAS OF<br>PHILADELPHIA COUNTY<br><br>FEBRUARY TERM 2017<br><br><br>No.:  0 3 5 3 6<br><br><br>COMMERCE COURT |

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to Defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

PHILADELPHIA BAR ASSOCIATION
Lawyer Referral and Information Service,
1101 Market Street, 11th Floor,
Philadelphia, PA 19107-2911
(215) 238-6333
**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso a notificacion. Ademas, la corte puede decider a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

**LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO 0 SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO. VAYA EN PERSONA 0 LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.**

ASSOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Informacion Legal
1101 Market Street, 11th Floor
Filadelfia, Pennsylvania 19107-2911
(215) 238-6333

Case ID: 170203536
Control No : 17022141

JACOBS LAW GROUP, PC
Richard E. Miller (I.D. No. 46451)
Samuel M. First (I.D. No. 66176)
2005 Market Street, Suite 1120
Philadelphia, PA 19107
215-569-9701

Of Counsel:

GREY STREET LEGAL, LLC
Janeen Olsen Dougherty (I.D. No. 65883)
356 N. Pottstown Pike, Suite 200
Exton, Pennsylvania 19341
(610) 594-4737
Attorneys for Plaintiff

| | |
|---|---|
| ALLIANCE LIFE SCIENCES<br>CONSULTING GROUP, INC.,<br>    265 Davidson Avenue, Suite 310,<br>    Somerset, NJ 08873<br><br>                Plaintiff<br><br>        v.<br><br>LASZLO FABRICZI,<br>    221 Johns Lane<br>    Neshamic Station, NJ 08853<br><br>       and<br><br>QUINTILES IMS (f/k/a IMS Health),<br>    One IMS Drive<br>    Plymouth Meeting, PA 19462<br><br>              Defendants. | COURT OF COMMON PLEAS OF<br>PHILADELPHIA COUNTY<br><br>FEBRUARY TERM 2017<br><br><br>No.: O 3536<br><br><br>COMMERCE COURT |

## VERIFIED COMPLAINT

Plaintiff, Alliance Life Sciences Consulting Group, Inc. (hereafter "Alliance", "Alliance

Life Sciences" or "Plaintiff"), brings this Complaint for preliminary and permanent injunctive

relief and money damages, against former employee, Laszlo Fabriczi ("Fabriczi") and against

Fabriczi's current employer, Quintiles IMS, f/k/a IMS Health ("IMS"), (Fabriczi and IMS are hereinafter collectively referred to as "Defendants"), and in support thereof avers as follows:

### The Parties

1.    Alliance Life Sciences is a Delaware corporation, having its principal place of business located at 265 Davidson Avenue, Suite 310, Somerset, NJ 08873.

2.    Fabriczi is an adult individual residing at 221 Johns Lane, Neshamic Station, New Jersey 08853.

3.    IMS is a Delaware corporation with offices worldwide. Its U.S. headquarters is located in Plymouth Meeting, Pennsylvania. IMS regularly conducts business in Philadelphia, Pennsylvania.

4.    Fabriczi is currently working for IMS at its offices located at 100 IMS Drive, Parsippany, New Jersey 07054.

### Jurisdiction and Venue

5.    This Court has jurisdiction over Alliance Life Sciences and Fabriczi because the Fabriczi Employment Agreement between the parties requires any motion for injunctive relief to be "litigated exclusively in the federal or state courts located in Philadelphia, Pennsylvania, and the parties hereby consent and submit to the jurisdiction and venue of such courts". Venue is proper in Philadelphia for the same reason.

6.    This Court has jurisdiction over IMS because it regularly conducts business in the Commonwealth of Pennsylvania, and further because its employee, Fabriczi, has agreed to the jurisdiction of this Court.

2

### Nature of Dispute

7.      Alliance Life Sciences is seeking preliminary injunctive relief against Defendants, while its claims for a permanent injunction and monetary damages are resolved in arbitration. Plaintiff's claims arise from (1) Fabriczi's breach of his restrictive covenants contained in his employment agreement with Alliance by going to work for IMS, a direct competitor of Alliance, and (2) IMS' unlawful business practices in hiring former Alliance employees in violation of the restrictive covenants in their employment agreements, and using such former employees to compete with Alliance for the same customers.

8.      IMS is currently employing two former Alliance employees (one being Fabriczi) who are both prohibited from working for IMS, a direct competitor of Alliance, pursuant to restrictive covenants contained in their employment agreements with Alliance.

9.      Both former employees are working for IMS on a project for an existing client of Alliance, which also violates the restrictive covenants.

10.     Prior to leaving Alliance, Fabriczi was responsible for putting together Alliance's unsuccessful proposal for the same (or similar) project that he is now working on for IMS, a further violation of his restrictive covenants.

### Alliance Life Sciences

11.     Alliance Life Sciences is a leading provider of management and technology consulting services to life sciences organizations.  The company provides a host of global solutions in the primary areas of contracting, pricing, compliance, reimbursement and market access, contract strategy, revenue management and commercial operations and analytics. Alliance offers its healthcare customers a wide range of capabilities to successfully define, deploy and support its customers' critical business applications.

3

12.     Alliance Life Sciences has a proven track record of working with a variety of life sciences clients including pharmaceutical, consumer health and medical device manufacturers and distributors, providers, payers, government agencies, biotechnology and consumer healthcare companies.

13.     Alliance Life Sciences operates its business successfully by building relationships with life sciences organizations so as to gain a full understanding of their dynamic, ever-changing needs for technology solutions.

14.     Alliance Life Sciences is in a competitive industry in which the protection of client relationships, and knowledge and understanding of the information technology needs of its clients, is critical to success.

15.     Because life sciences organizations are constantly challenged by economic and regulatory changes in the environments in which they operate, Alliance Life Sciences and other information technology consulting firms constantly compete for the opportunity to provide next-generation and next-stage solutions to their clients.

16.     The protection of Alliance Life Sciences' confidential, proprietary and trade-secret information is critical to preventing competitors from obtaining an unfair advantage in the market.

17.     Through a substantial investment of its time, resources, expense, unique and proprietary methods, pricing, contracts and databases, Alliance Life Sciences has been successful in anticipating its clients' and prospective clients' information technology needs, and has forged successful relationships with those clients, giving Alliance Life Sciences an important competitive edge in the life sciences consulting market.

4

18.    Alliance Life Sciences carefully protects its proprietary trade secrets and
confidential information from those outside of the company by requiring Alliance employees
who have access to confidential information to sign employment agreements protecting against
the disclosure of such information, prohibiting post-employment activities with or on behalf of
competitors of Alliance Life Sciences, and further prohibiting the solicitation of Alliance Life
Sciences customers or employees, subject to reasonable time and geographic limitations.

### Quintiles IMS

19.    IMS is a publicly traded company (NYSE: Q) that provides integrated
information and technology solutions to healthcare clients throughout the world, including large
pharmaceutical clients.

20.    IMS has a global team of over 50,000 professionals operating in over 100
markets, including the market in which Alliance Life Science operates.

21.    IMS directly competes with Alliance in that market.

### Laszlo Fabriczi

22.    Laszlo Fabriczi ("Fabriczi") was employed by Alliance Life Sciences (and its
predecessor Alliance Consulting Group Associates, Inc. ("ACG")), for approximately ten (10)
years, until his voluntary resignation on October 24, 2016.

23.    Prior to his resignation, Fabriczi was the Senior Vice President and Practice
Leader for Alliance's Contract Strategy, Operations and Compliance practice ("CSOC"). In this
senior management position, Fabriczi was responsible for the overall managerial oversight of
CSOC, and also had significant customer-facing responsibilities for some of Plaintiff's largest
clients.

5

24.     Plaintiff's CSOC practice provides contract management systems and solutions to customers in the life sciences industries. At its essence, CSOC offers customers processes to enable them to create, execute, analyze and optimize their contracts. CSOC services help customers to predict, address and clarify their commercial, government and legal contracting requirements. CSOC services also assist customers with achieving improved business analytics, revenue loss prevention, reduced risk, increased compliance and maximization of revenue.

25.     Plaintiff's CSOC practice represents approximately 35% of Alliance Life Sciences' annual gross revenue.

26.     In his position as the CSOC Practice Leader, Fabriczi acquired the highly-sensitive and non-public knowledge necessary to oversee, develop and implement all of Plaintiff's CSOC offerings including, but not limited to: (a) business process outsourcing; (b) Gross-to-Net Analytics; (c) Contract Analytics; (d) Government Pricing; (e) Contract Operations and Performance; (f) Business Process Improvement; (g) Program Management; (h) Data Transformation; and (i) Data Integration and Warehousing.

27.     Fabriczi's highly-sensitive and confidential knowledge includes information regarding specific customer needs, cost structuring, pricing, promotion and contract strategies for the sale of CSOC services, as well as project proposals and specifications for Alliance Life Sciences' customers.

28.     If a competitor acquired this highly-sensitive and confidential information, it would have a substantial and unfair advantage over Alliance in competitive bidding situations.

### Fabriczi's Restrictive Covenants

29.     Due to the competitive value of the confidential information and the customer relationships that Fabriczi was to gain access to as an employee of Alliance, Fabriczi executed

6

employment agreements which contain restrictive covenants regarding non-solicitation, non-competition and confidentiality obligations.

30.    Fabriczi was therefore aware from the inception of his employment with Alliance Life Sciences that these covenants were important conditions to his employment with Alliance.

31.    Fabriczi's signed his first employment agreement when he joined ACG (the predecessor to Alliance Life Sciences), in December 2006.

32.    Following a corporate restructuring of ACG that included the formation of Alliance Life Sciences, Fabriczi was then offered employment with Alliance as Engagement Manager.  In connection with this new employment, Fabriczi signed a new employment agreement dated July 7, 2008 (the "Fabriczi Employment Agreement").  A partially redacted copy of the Fabriczi  Employment Agreement is attached as Exhibit "A".

33.    Execution of the Fabriczi Employment Agreement was a necessary condition of Fabriczi's employment with Alliance Life Sciences.  Without this agreement, Fabriczi would not have been permitted or able to perform his responsibilities for Alliance Life Sciences.

34.    The Fabriczi Employment Agreement contains the following restrictive covenants (the "Fabriczi Restrictive Covenants"):

9.    Non-Competition, Confidentiality and Assignment of Inventions.

(a)    Non-solicitation. For so long as the Executive shall be employed by the Company and for a period of one (1) year thereafter, the Executive shall not, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity (as an employee, officer, director, shareholder, partner, agent, principal, independent contractor, owner or otherwise) (i) induce or attempt to induce any employee or independent contractor of the Company to terminate his or her employment or other relationship with the Company, (ii) hire any employee or independent contractor employed or engaged by the Company during the two-year period of time preceding the Employee's termination date; (iii) divert or solicit business from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or (iv) cause or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain from doing business with the Company or adversely affect the business they do or plan to do with or give to the Company The term "Current Customer(s)/Client(s)" means any entity for whom Company was providing services or with whom it had an active contract or

7

engagement as of Executive's date of termination. The term "Former Customer(s)/Client(s)" means all entities for whom Company provided services or with whom it had an active contract or engagement at any time within the one (1) year period immediately preceding the date of Executive's termination. The term "Future Customer(s)/Client(s)" means any entity with whom Company had substantive conversations about a potential engagement prior to the date of Executive's termination, and who was still actively considering such engagement as of the date of Executive's termination.

(b)     Non-compete. For so long as Employee shall be employed by the Company and for a period of one (1) year thereafter, the Employee shall not, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity (as an employee, officer, director, shareholder, partner, agent, principal, independent contractor, owner or otherwise) engage in or be financially interested in any business operation which engages in whole or in part, in information technology consulting and/or business consulting services either on a time and materials, project or fixed price basis, including by means of example but not limited to strategic development, design, programming, implementation, staffing and/or support services within 75 miles of the Company's office in Bridgewater, New Jersey or any other Company office where Employee has had material involvement with the Company's business, clients or affairs during the one (1) year immediately preceding the termination of the Employee's employment (regardless of whether terminated by the Company or by Employee). Notwithstanding anything stated in this section 9(b), if Employee is terminated without Cause within the first year of employment, the Noncompete period will be six (6) months after termination and if the Employee is terminated without Cause after the first year of employment, the Non-compete period will be twelve (12) months after termination.

(c)     Confidentiality. During the Employee's employment and at all times thereafter, the Employee shall not use for the Employee's personal benefit, or disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association or company, other than the Company, any confidential information and/or proprietary information (collectively "Confidential Information") which the Employee acquires in the course of her employment which is not otherwise lawfully known by and readily available to the general public. This Confidential Information includes, but is not limited to: any information regarding the Company's business methods, policies, procedures or techniques; pricing information and strategy; customer purchasing, contracting and leasing needs; inventions, including discoveries, improvements or ideas, whether potential or not; research, marketing or development projects, results or studies; financial controls, methods of development bids, estimates, direct and indirect costs; employee compensation information; trade secrets or other knowledge or processes of or developed by the Company; any names and addresses of employees, suppliers, customers or clients; any data on or relating to past, present or prospective customers or clients and any other confidential information relating to or dealing with the business operations or activities of the Company, made known to the Employee or learned or acquired by the Employee while in the employ of the Company. Notwithstanding anything to the contrary above, Confidential Information shall not include any information that (i) can be demonstrated as having been known to Employee prior to his hire by Company, or (ii) is or becomes generally available to the public other than as a result of a disclosure by Employee.

35.     In exchange for Fabriczi's agreement to be bound by the obligations and

restrictions set forth in the Fabriczi Employment Agreement, including the Fabriczi Restrictive

Case ID: 170203536
Control No : 17022141

Covenants set forth in Section 9 therein, Alliance Life Sciences further agreed to recommend to its board of directors (the "Board") that Fabriczi be offered a significant number of stock options (the "Options").

36.     After Fabriczi signed the Fabriczi Employment Agreement confirming his intention to honor the obligations and restrictions contained therein, the Board approved the stock option grant and Fabriczi received the Options.

37.     Alliance Life Sciences regularly conducts its business within and well beyond the seventy-five (75) mile area described in the Fabriczi Employment Agreement.

38.     Fabriczi agreed to these restrictions in exchange for the offer of new employment with Alliance Life Sciences and the equity compensation that he received in the form of the Options.

39.     To fulfill his responsibilities for Alliance Life Sciences, Fabriczi was provided with the resources that he requested or needed, including substantial confidential information regarding Alliance's clients, client purchasing and contracting needs, pricing information and marketing and strategic development efforts.

40.     During his employment with Alliance Life Sciences, Fabriczi also received the benefit of Alliance's extensive advertising and marketing investment, as well as its contacts and goodwill in the industry and trade.

41.     While employed at Alliance Life Sciences, Fabriczi had open access to all of its records, office facilities, resources, handbooks, catalogues, databases, forms, contacts, customer information and pricing information.

42.     Fabriczi has therefore been privy to Alliance Life Sciences' trade secrets and confidential information relating to every aspect of Plaintiff's business, including but not limited

9

to CSOC.

43.    During his employment with Alliance Life Sciences, Fabriczi was integrally involved in developing and implementing an aggressive strategy to position Alliance Life Sciences to expand its service offerings and capabilities within CSOC. As part of this strategic plan, Fabriczi was centrally involved in and privy to pricing, promotion and customer strategies for the marketing and sale of life sciences technology services.

44.    To begin to fulfill this strategic growth plan, Fabriczi continued to leverage the relationships that he had developed on behalf of Alliance Life Sciences by arranging meetings with new and existing clients, and recruiting new employees with varied subject matter specializations.

<u>Customer 1's Data Harmonization Project</u>

45.    In the second and third quarters of 2016, Alliance Life Sciences was asked by one of its most important pharmaceutical customers ("Customer 1") to provide a proposal for data management services (the "Data Harmonization Project"). The Data Harmonization Project was offered by Customer 1's Commercial Contract Improvement ("CCI") business division. If successful, the Data Harmonization Project would have provided Alliance Life Sciences with approximately $7 million in gross revenues.

46.    As the CSOC Practice Leader, Fabriczi was in charge of preparing the proposal for the Data Harmonization Project (the "Proposal").

47.    Fabriczi was the primary author and architect of the Proposal and, as such, was responsible for sourcing and including all of the relevant information, including the names of specific employee resources who would be responsible for performing the work, as well as the description, timing and pricing of all deliverables and other business terms to be included in the

10

applicable statements of work.

48.     In preparing the Proposal, Fabriczi identified himself as the Project Manager, and further identified another Alliance Life Sciences' employee, Nicole Alcorn ("Alcorn"), as the key resources to staff the Data Management Project work (if Alliance received the project).

49.     Through the Proposal, Fabriczi and Alcorn were specifically identified to Customer 1 as experienced and capable resources who would provide valuable services to the Customer 1 on the Data Harmonization Project if Alliance was awarded the project.

50.     In August 2016, Alliance Life Sciences was informed by Customer 1 that another company had been selected for the Data Harmonization Project.

Fabriczi and Alcorn Resign

51.     In early October 2016, both Fabriczi and Alcorn gave Alliance notice of their resignation.

52.     Fabriczi gave notice that he was resigning from Alliance Life Sciences effective October 21, 2016, and Alcorn gave notice of her resignation effective October 17, 2016.

53.     At that time, Fabriczi told Alliance that he was going to work Merck.

54.     Based upon his representation that he was not going to work for a competitor of Alliance Life Sciences, Fabriczi was permitted to continue working for Alliance Life Sciences until his resignation (which actually occurred on October 24th), during which time his access to Alliance's most sensitive information continued.

55.     Had had Alliance known the truth – that Fabriczi intended to work for a competitor - Fabriczi would not have been allowed to continue to receive such highly confidential information.

11

56.     Alcorn did not identify where she was going to be working following her employment with Plaintiff, but assured Alliance that she was not going to go work for a competitor.

57.     Alcorn's employment agreement with Alliance also contains non-solicitation, non-competition and confidentiality covenants restricting her post-employment business activities. A copy of her employment agreement is attached as Exhibit "B".

### Fabriczi Immediately Attempts to Work for a Competitor

58.     Unbeknownst to Plaintiff, Fabriczi had planned to immediately go work for a competitor of Alliance Life Sciences upon his resignation.

59.     Shortly after his resignation, Alliance learned that Fabriczi was planning on joining Cumberland Consulting Group, LLC ("Cumberland"), a direct competitor of Alliance Life Sciences.

60.     Alliance notified both Cumberland and Fabriczi of its objection to such employment in light of the restrictive covenants in the Fabriczi Employment Agreement.

61.     In November 2016, Cumberland withdrew its offer to Fabriczi.

### IMS Hires Fabriczi and Alcorn, in Direct Violation of Their Restrictive Covenants

62.     Unbeknownst to Alliance, within months of their resignations, IMS hired both Fabriczi and Alcorn, in complete disregard of the restrictive covenants contained in their respective employment agreements.

63.     IMS is a direct competitor of Alliance in the life sciences consulting business.

64.     Both companies provide information technology consulting solutions and services to life sciences organizations, including pharmaceutical, consumer health and medical device manufacturers and distributors, providers, payers and governmental agencies.

12

65.     Both companies regularly compete with each other in project proposals for the same life sciences customers.

66.     As reflected on its website, IMS offers "Master Data Management", "Performance Analytics", "Compliance & Transparency", and data compliance services that are also part of Alliance's CSOC practice (which is the practice that Fabriczi managed).

67.     Alliance Life Sciences and IMS compete for information technology services business from the same clients, and that business represents approximately 35% of Alliance Life Sciences' revenues.

68.     Therefore, Fabriczi's and Alcorn's employment with IMS constitutes direct competition with a substantial portion of Alliance Life Sciences' business.

69.     Neither IMS, Fabriczi nor Alcorn informed Alliance about their employment with IMS.

70.     Fabriczi and Alcorn are both currently working at IMS's Parsippany, New Jersey offices, which is located 33.5 miles from Alliance Life Sciences' headquarters, which is within the restricted territories set forth in their respective restrictive covenants.

71.     Their employment with IMS directly violates the restrictive covenants in their Alliance employment agreements.

Alliance Learns That Its Former Employees Are Unlawfully Employed by IMS

72.     On January 24, 2017, Alliance learned of IMS's unlawful employment of Plaintiff's former employees.

73.     On that date, an email inadvertently sent to Alcorn's former Alliance email address revealed that both Fabriczi and Alcorn are currently working for IMS.  A copy of the

13

email (the "January 24[th] Email") is attached as Exhibit "C".[1]

74.    In the January 24th Email, Lois Byra ("Byra"), an employee of Customer 1,
confirms that IMS had been contracted by Customer 1 to work on a project identified as "CCI
Phase 2", and that Fabriczi and Alcorn are the IMS employees that were to be "on-site
tomorrow" to begin performing this work. *See* Exhibit "C".

75.    IMS's statement of work ("SOW") for the CCI Phase 2 project contains the same,
or substantially the same, work that Alliance proposed to do for the Data Harmonization Project.

76.    Lois Byra, the Customer 1 employee that requested Fabriczi and Alcorn to be
"on-site tomorrow", is also a former Alliance Life Sciences employee.  Byra resigned from
Alliance in April 2016.

77.    Byra's employment agreement with Alliance contains restrictive covenants
prohibiting her from soliciting former employees of Alliance for eighteen months from her
resignation from Alliance.  A copy of her Alliance employment agreement is attached as Exhibit
"D".

78.    Byra has breached those covenants by requesting that Fabriczi and Alcorn work
on the CCI Phase 2 project.

IMS Admits That It Hired Fabriczi and Alcorn
to Perform the Same Work That Alliance Proposed to Do

79.    After receiving the January 24th Email, Alliance contacted Christopher Leibfreid
("Leibfreid"), IMS' Practice Leader for Systems Implementation and Integration, by email to
object to Fabriczi and Alcorn working for IMS and providing services to Customer 1.  A copy of
that email is attached as Exhibit "E".

---

[1] Exhibits "C" and "E" through "H" have been partially redacted to conceal the identity of Customer 1 and its
employees, other than Lois Byra.  Unredacted exhibits will be provided at the preliminary injunction hearing.

14

80.    In a subsequent phone call, Leibfreid confirmed that the vendor that was awarded the Data Harmonization Project was having trouble completing it, and IMS had been brought in to complete that work.

81.    The CCI Phase 2 work IMS was hired to perform is believed to be part of the Data Harmonization Project.

82.    Byra was one of the individuals at Customer 1 responsible for selecting Fabriczi and Alcorn for the CCI Phase 2 work.

83.    Byra was also the contact person at Customer 1 for the proposal Alliance previously submitted for the Data Harmonization Project, and as such was intimately familiar with the specifics of that proposal, including the fact that Fabriczi and Alcorn were identified as key  personnel for the project.

84.    Byra was also aware of their expertise based on her prior employment relationship with Alliance Life Sciences.

85.    Plaintiff believes that Byra also directly solicited Fabriczi and Alcorn for the CCI Phase 2 work.

86.    Based on Byra's recommendation, Customer 1 selected IMS for the CCI Phase 2 work so that Fabriczi and Alcorn could provide their services directly to Customer 1.

Alliance Notifies IMS, Fabriczi and Alcorn of Its Objection to Their Employment

87.    On January 26, 2017, Alliance Life Sciences sent letters to both Fabriczi and Alcorn objecting to their employment with IMS as violative of their post-employment restrictions owed to Alliance Life Sciences. A copy of Alliance Life Sciences' letters to Fabriczi and Alcorn are attached as Exhibits "F" and "G" respectively.

15

88. Alliance further wrote to IMS that same day objecting to its employment of Fabriczi and Alcorn. A copy of Alliance Life Sciences' letter to IMS is attached as Exhibit "H".

89. To date, IMS has continued to employ Fabriczi and Alcorn, and has allowed them to provide services to Customer 1, including work on the CCI Phase 2 project.

90. Given IMS' refusal to terminate Fabriczi and Alcorn, and/or to remove Fabriczi and Alcorn from working for Customer 1, it is highly likely that Fabriczi's anticipated work for IMS includes direct involvement and responsibility for the same work for which he was responsible at Alliance as the Senior Vice President and Practice Leader for CSOC.

91. This is further confirmed by the fact that both the Data Harmonization Project and the CCI Phase 2 work are both part of Customer 1's CCI business.

92. Upon information and belief, both the Data Harmonization Project and the CCI Phase 2 work are managed by the same management personnel at Customer 1, have the same Customer 1 internal stakeholders, and are reported as part of the same Customer 1 P&L business operations.

93. Fabriczi's work for Customer 1 through IMS has therefore been obtained and leveraged by reason of Alliance Life Sciences' own relationship with Customer 1, by Fabriczi's introduction to Customer 1 while employed by Alliance Life Sciences, and by Fabriczi's specific valuable knowledge and experience learned during the course of his employment with Alliance Life Sciences.

94. Upon information and belief, the precise reason why IMS wanted to hire Fabriczi is because of his experience and prior association with Alliance Life Sciences, and in order to draw upon Alliance trade secrets learned during the course of his employment with Plaintiff.

16

95.     Therefore, it is critical for Alliance Life Sciences to have the enforcement of the one-year period of time for non-solicitation and non-competition required by the Fabriczi Employment Agreement.

96.     Alliance Life Sciences needs at least this period of time to protect its valuable customer relationships and to prevent the deterioration of those relationships by a direct competitor's association with the person who served the essential role of Senior Vice President and CSOC Practice Leader for Plaintiff.

97.     Alliance Life Sciences further needs this period of time to secure a new CSOC Practice Leader and have this new employee be able to demonstrate effectiveness and solidify Alliance Life Sciences' critical client relationships.

98.     As a direct result of his position as CSOC Practice Leader and his preparation of the Data Harmonization Project Proposal, Fabriczi is known to Customer 1.

99.     Fabriczi's continued involvement with the CCI Phase 2 work for Customer 1 will continue to jeopardize Alliance Life Sciences' ability to secure additional work from Customer 1.

100.     IMS has unjustly received, and will continue to unjustly receive, the benefit of the investment that Alliance Life Sciences put into developing Fabriczi's experience, skills and knowledge in the CSOC arena.

101.     Fabriczi was a customer-facing Practice Leader for Alliance Life Sciences, and a Project Manager for large scale projects. As a result, he is currently poised to penetrate Alliance Life Sciences' client base and accelerate IMS' exploitation of opportunities that would otherwise be available to Alliance Life Sciences' plan.

102.     As a result, immediate injunctive relief is appropriate while this dispute is arbitrated.

17

Count I
Breach of Contract
(Alliance Life Sciences v. Fabriczi)

103. The allegations in the preceding paragraphs are incorporated herein by reference as if fully set forth at length.

104. Fabriczi knowingly, and for valid consideration, entered into the Fabriczi Employment Agreement ancillary to his employment with Alliance Life Sciences.

105. Pursuant to the Fabriczi Employment Agreement, and in exchange for a requested restructuring of his compensation package, Fabriczi agreed to be bound by the terms of certain non-competition, non-solicitation and confidentiality obligations set forth in the Restrictive Covenants.

106. The Fabriczi Employment Agreement is a lawful contract voluntarily and knowingly entered into by Fabriczi.

107. The Fabriczi Restrictive Covenants are lawful and binding contractual obligations.

108. Fabriczi's employment with IMS violated, and continues to violate, his contractual obligations under the Fabriczi Employment Agreement, including, but not limited to, the Fabriczi Restrictive Covenants.

109. By accepting employment with IMS, Fabriczi breached and continues to breach the Fabriczi Employment Agreement, as IMS is a direct competitor of Plaintiff within the restricted territory.

110. By doing work for the benefit of Customer 1, Fabriczi has breached and continues to breach the Fabriczi Employment Agreement.

18

111.    By accepting employment with IMS, and by doing work for the benefit of Customer 1, Fabriczi has also breached his implied contractual duties of good faith and fair dealing.

112.    As a direct and proximate result of Fabriczi's ongoing breach of the Fabriczi Employment Agreement, Alliance Life Sciences has suffered, and continues to suffer, irreparable harm.

113.    As a direct and proximate result of Fabriczi's ongoing breach of the Fabriczi Employment Agreement, Alliance Life Sciences has suffered, and continues to suffer, monetary damages.

114.    Fabriczi's conduct was and is willful, intentional, and unprivileged.

WHEREFORE, Alliance Life Sciences demands judgment in its favor and against Fabriczi as follows:

A.      An injunction effective immediately and for one year from the date of judgment, prohibiting Fabriczi, directly or indirectly, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.      Continuing in the employment of IMS, or providing any services to IMS in any other business-related capacity;

2.      Working for, assisting, engaging in or having a financial interest in any business operation within 75 miles of the Alliance's offices which engages, in whole or in part, in information technology consulting and/or business consulting services, including by means of example but not limited to, strategic development, design, programming, implementation, staffing and/or support services; and

19

3.      (i) Inducing or attempting to induce any employee or independent

contractor of Alliance to terminate his or her employment or other relationship with Alliance,

(ii) hiring any employee or independent contractor employed or engaged by Alliance during the

two-year period of time preceding Fabriczi's termination date; (iii) diverting or soliciting

business from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or

(iv) cause or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain

from doing business with Alliance or adversely affect the business they do or plan to do with or

give to Alliance (as those terms are defined in the Fabriczi Employment Agreement);

B.      A permanent injunction effective immediately prohibiting Fabriczi, directly or

indirectly, for his own benefit or the benefit of any other person or entity, directly or indirectly,

in any capacity, whether alone or in concert with others, from disclosing, communicating,

divulging or using, for the direct or indirect benefit of any person, firm, association or company,

other than Alliance, any Confidential Information (as defined in the Fabriczi Employment

Agreement), and requiring Fabriczi to immediately return all Confidential Information in his

possession or control;

C.      Monetary damages to which Alliance Life Sciences is entitled to recover as a

result of Fabriczi's breach of the Fabriczi Employment Agreement;

D.      Incidental and consequential damages as permitted by law;

E.      Attorneys' fees and costs as permitted by law; and

F.      Such other relief as this Court deems appropriate.

20

## COUNT II
### Conspiracy and Aiding and Abetting Tortious Conduct
### (Alliance Life Sciences v. Fabriczi and IMS)

116.    Plaintiff incorporates by reference herein the preceding paragraphs as if fully set forth at length.

117.    Fabriczi and IMS, at all times relevant, were aware of the Restrictive Covenants in the Fabriczi Employment Agreement, and the restrictive covenants in Alcorn's employment agreement.

118.    Fabriczi and IMS, at all times relevant, were aware of Fabriczi's and Alcorn's involvement with the Data Harmonization Project proposal.

119.    Fabriczi and IMS, at all times relevant, were aware that Fabriczi and Alcorn were contractually prohibited from working for IMS or Customer 1, and from soliciting the customers and current and former employees of Alliance on behalf of IMS.

120.    Fabriczi and IMS, at all times relevant, were aware that Fabriczi and Alcorn have a legal obligation to not use Alliance's confidential information or otherwise reveal that information to IMS.

121.    Fabriczi and IMS collectively conspired and acted in conjunction with Alcorn and Byra to unlawfully compete with Alliance; unlawfully solicit Alliance's customers and current and former employees; and unlawfully utilize Alliance's confidential information in furtherance of those efforts.

122.    Fabriczi and IMS collectively conspired and acted in conjunction with Alcorn and Byra to unlawfully interfere with Alliance's current and prospective contractual relations with its former employees and current and prospective clients.

21

123.    IMS provided Fabriczi and Alcorn with the support they needed to perform services on behalf of Client 1, and otherwise unlawfully compete with Alliance.

124.    In doing so, IMS and Fabriczi collectively aided and abetted the tortious conduct of the other, and of Alcorn and Byra.

125.    As a direct and proximate result of these Defendants' activities in aiding and abetting the tortious conduct of others, Alliance has suffered and will continue to suffer irreparable harm and monetary damages.

126.    Defendants' conduct was sufficiently wanton, willful and reckless as to justify an award of punitive damages.

WHEREFORE, Alliance Life Sciences demands judgment in its favor and against Fabriczi and IMS as follows:

A.    An injunction effective immediately and for one year from the date of judgment, prohibiting Fabriczi, directly or indirectly, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.    Continuing in the employment of IMS or providing any services to IMS in any other business-related capacity;

2.    Working for, assisting, engaging in or having a financial interest in any business operation within 75 miles of the Alliance's offices which engages, in whole or in part, in information technology consulting and/or business consulting services, including by means of example but not limited to, strategic development, design, programming, implementation, staffing and/or support services; and

3.    (i) Inducing or attempting to induce any employee or independent contractor of Alliance to terminate his or her employment or other relationship with Alliance,

22

(ii) hiring any employee or independent contractor employed or engaged by Alliance during the two-year period of time preceding Fabriczi's termination date; (iii) diverting or soliciting business from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or (iv) cause or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain from doing business with Alliance or adversely affect the business they do or plan to do with or give to Alliance (as those terms are defined in the Fabriczi Employment Agreement);

B.      A permanent injunction effective immediately prohibiting Fabriczi or IMS, directly or indirectly, for their own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from disclosing, communicating, divulging or using, for the direct or indirect benefit of any person, firm, association or company, other than Alliance, any Confidential Information (as defined in the Fabriczi Employment Agreement), and requiring Fabriczi and IMS to immediately return all Confidential Information in their possession or control;

C.      An injunction effective immediately and for one year from the date of judgment, prohibiting IMS, directly or indirectly, for its own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.      Employing, consulting with, or receiving the services of Fabriczi or Alcorn;

2.      Using, disclosing, or receiving, for any purpose, any Confidential Information of Alliance (as that term is defined in the Fabriczi Employment Agreement);

3.      Diverting any business, or soliciting or accepting competitive business from any Current, Former or Future Customer(s)/Client(s) of Alliance Life Sciences or its predecessors and/or affiliates, as those terms are defined in the Fabriczi Employment Agreement;

23

4.      Inducing or attempting to induce any employee or independent contractor

of Alliance Life Sciences or its affiliates, to terminate his or her employment or other relationship

with Alliance; and

5.      Hiring any employee or independent contractor employed or engaged by

Alliance Life Sciences, or its predecessors and/or affiliates in the one (1) year preceding

Fabriczi's termination of employment.

D.      Monetary damages to which Alliance Life Sciences is entitled to recover as a

result of Fabriczi's breach of the Fabriczi Employment Agreement;

E.      Incidental and consequential damages as permitted by law;

F.      Punitive damages;

G.      Attorneys' fees and costs as permitted by law; and

H.      Such other relief as this Court deems appropriate.

## COUNT III
### Tortious Interference with Current and Prospective Contractual Relations
### (Alliance Life Sciences v. Fabriczi and IMS)

127.    Plaintiff incorporates by reference herein the preceding paragraphs as if fully set

forth at length.

128.    As set forth above, Alliance Life Sciences has existing contractual relationships

with Fabriczi, Alcorn and Byra.

129.    At all times relevant, Customer 1 was and is a customer of Alliance.

130.    At all times relevant, the Defendants knew or should have known that Fabriczi

and Alcorn were required to comply with the restrictive covenants in their respective

employment agreements.

24

131.    At all times relevant, the Defendants knew or should have known that Fabriczi and Alcorn were not permitted to work for IMS, or to solicit Alliance's employees or current or future customers.

132.    At all times relevant, the Defendants knew or should have known that Fabriczi and Alcorn were not permitted to use or disseminate confidential information of Alliance.

133.    At all times relevant, the Defendants knew or should have known that it was unlawful for IMS to hire the Fabriczi and Alcorn, to have Fabriczi and Alcorn work on a project for Customer 1, or to act in concert with Fabriczi and Alcorn in competing with Alliance in any manner.

134.    IMS and Fabriczi interfered with Alliance's existing contractual relationships with Alcorn and Byra by hiring Alcorn and by supporting both of their activities in violation of the restrictive covenants in their employment agreements.

135.    IMS interfered with Alliance's existing contractual relationship with Fabriczi by hiring him and by supporting his activities in violation of the Restrictive Covenants in the Fabriczi Employment Agreements.

136.    IMS and Fabriczi interfered with Alliance's existing and prospective contractual relationships with current and future customers by acting in concert to work on the CCI Phase 2 project and by otherwise unlawfully competing with Alliance.

137.    IMS and Fabriczi knew or recklessly disregarded the fact that there existed contractual obligations between Alliance Life Sciences, Fabriczi, Alcorn and Byra at the time IMS employed Fabriczi and Alcorn, and then assigned them to work on a project for Customer 1.

138.    IMS and Fabriczi has tortiously interfered with Alliance Life Sciences' contractual relations with its former employees and existing and future customers engaging in

25

the concerted conduct describes above.

139.   The Defendants were not justified or privileged to interfere with Alliance's existing and prospective contractual relations in the manner in which they did.

140.   The Defendants' interference with Alliance Life Sciences' current and prospective contractual relationships continues to be willful and wanton, and has been carried out with a specific intent to injure Alliance Life Sciences in the conduct of its business.

141.   The Defendants' interference with Alliance's existing and prospective contractual relationships was tortious conduct under the law.

142.   As a direct and proximate result of the Defendants' tortious interference with Alliance's existing and prospective contractual relationships, Alliance has incurred, and will continue to be, irreparably harmed and suffer monetary damages.

143.   The Defendants' tortious conduct was sufficiently wanton, willful and reckless as to justify an award of punitive damages.

WHEREFORE, Alliance Life Sciences demands judgment in its favor and against Fabriczi and IMS as follows:

A.   An injunction effective immediately and for one year from the date of judgment, prohibiting Fabriczi, directly or indirectly, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.   Continuing in the employment of IMS or providing any services to IMS in any other business-related capacity;

2.   Working for, assisting, engaging in or having a financial interest in any business operation within 75 miles of the Alliance's offices which engages, in whole or in part, in information technology consulting and/or business consulting services, including by means of

26

example but not limited to, strategic development, design, programming, implementation, staffing and/or support services; and

        3.     (i) Inducing or attempting to induce any employee or independent contractor of Alliance to terminate his or her employment or other relationship with Alliance, (ii) hiring any employee or independent contractor employed or engaged by Alliance during the two-year period of time preceding Fabriczi's termination date; (iii) diverting or soliciting business from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or (iv) cause or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain from doing business with Alliance or adversely affect the business they do or plan to do with or give to Alliance (as those terms are defined in the Fabriczi Employment Agreement);

        B.     A permanent injunction effective immediately prohibiting Fabriczi or IMS, directly or indirectly, for their own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from disclosing, communicating, divulging or using, for the direct or indirect benefit of any person, firm, association or company, other than Alliance, any Confidential Information (as defined in the Fabriczi Employment Agreement), and requiring Fabriczi and IMS to immediately return all Confidential Information in their possession or control;

        C.     An injunction effective immediately and for one year from the date of judgment, prohibiting IMS, directly or indirectly, for its own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

        1.     Employing, consulting with, or receiving the services of Fabriczi or Alcorn;

27

2.    Using, disclosing, or receiving, for any purpose, any Confidential Information of Alliance (as that term is defined in the Fabriczi Employment Agreement);

3.    Diverting any business, or soliciting or accepting competitive business from any Current, Former or Future Customer(s)/Client(s) of Alliance Life Sciences or its predecessors and/or affiliates, as those terms are defined in the Fabriczi Employment Agreement;

4.    Inducing or attempting to induce any employee or independent contractor of Alliance Life Sciences or its affiliates, to terminate his or her employment or other relationship with Alliance; and

5.    Hiring any employee or independent contractor employed or engaged by Alliance Life Sciences, or its predecessors and/or affiliates in the one (1) year preceding Fabriczi's termination of employment.

D.    A permanent injunction requiring IMS to immediately return to Alliance Life Sciences any and all Confidential Information and copies thereof, and/or any other property of Alliance Life Sciences, whether electronic or otherwise, that it has in his possession, custody or control.

E.    Monetary damages that Alliance Life Sciences is entitled to recover as a result of the Defendants' tortious interference with Plaintiff's actual and prospective contractual relationships;

F.    Incidental and consequential damages as permitted by law;

G.    Punitive damages;

H.    Attorneys' fees and costs as permitted by law; and

I.    Such other relief as this Court deems appropriate.

28

Count IV
Unfair Competition
Alliance Life Sciences v. Fabriczi and IMS

144.   Plaintiff incorporates by reference herein the preceding paragraphs as if fully set forth at length.

145.   Defendants, by engaging in the conduct described above, are and have been unlawfully competing with Alliance Life Sciences.

146.   Defendants have engaged in unfair competition by tortiously interfering with Alliance's contracts, unlawfully hiring Alliance's former employees, unlawfully using Alliance's Confidential Information, engaging in other acts or practices that are actionable under federal or state statutes, and engaging in business practices that hinder, rather than promote, the efficient operation of the market.

147.   Defendants' aforesaid conduct was and is intended to gain an unfair competitive advantage over Alliance Life Sciences' business.

148.   As a direct and proximate result of Defendants' tortious conduct, Alliance has suffered, and will continue to suffer, irreparable harm.

149.   As a direct and proximate result of Defendants' tortious conduct, Alliance has suffered, and will continue to suffer, monetary damages.

150.   Defendants conduct has been carried out with a specific intent to injure Alliance Life Sciences in the conduct of its business and to gain an unfair competitive advantage over Alliance Life Sciences.

151.   Defendants' tortious conduct was sufficiently wanton, willful and reckless as to justify an award of punitive damages.

29

WHEREFORE, Alliance Life Sciences demands judgment in its favor and against Fabriczi and IMS as follows:

A.      An injunction effective immediately and for one year from the date of judgment, prohibiting Fabriczi, directly or indirectly, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.      Continuing in the employment of IMS or providing any services to IMS in any other business-related capacity;

2.      Working for, assisting, engaging in or having a financial interest in any business operation within 75 miles of the Alliance's offices which engages, in whole or in part, in information technology consulting and/or business consulting services, including by means of example but not limited to, strategic development, design, programming, implementation, staffing and/or support services; and

3.      (i) Inducing or attempting to induce any employee or independent contractor of Alliance to terminate his or her employment or other relationship with Alliance, (ii) hiring any employee or independent contractor employed or engaged by Alliance during the two-year period of time preceding Fabriczi's termination date; (iii) diverting or soliciting business from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or (iv) cause or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain from doing business with Alliance or adversely affect the business they do or plan to do with or give to Alliance (as those terms are defined in the Fabriczi Employment Agreement);

B.      A permanent injunction effective immediately prohibiting Fabriczi or IMS, directly or indirectly, for their own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from disclosing,

30

communicating, divulging or using, for the direct or indirect benefit of any person, firm, association or company, other than Alliance, any Confidential Information (as defined in the Fabriczi Employment Agreement), and requiring Fabriczi and IMS to immediately return all Confidential Information in their possession or control;

    C.    An injunction effective immediately and for one year from the date of judgment, prohibiting IMS, directly or indirectly, for its own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

    1.    Employing, consulting with, or receiving the services of Fabriczi or Alcorn;

    2.    Using, disclosing, or receiving, for any purpose, any Confidential Information of Alliance (as that term is defined in the Fabriczi Employment Agreement);

    3.    Diverting any business, or soliciting or accepting competitive business from any Current, Former or Future Customer(s)/Client(s) of Alliance Life Sciences or its predecessors and/or affiliates, as those terms are defined in the Fabriczi Employment Agreement;

    4.    Inducing or attempting to induce any employee or independent contractor of Alliance Life Sciences or its affiliates, to terminate his or her employment or other relationship with Alliance; and

    5.    Hiring any employee or independent contractor employed or engaged by Alliance Life Sciences, or its predecessors and/or affiliates in the one (1) year preceding Fabriczi's termination of employment.

    D.    A permanent injunction requiring IMS to immediately return to Alliance Life Sciences any and all Confidential Information and copies thereof, and/or any other property of

31

Alliance Life Sciences, whether electronic or otherwise, that it has in his possession, custody or control.

    E.    Monetary damages that Alliance Life Sciences is entitled to recover as a result of the Defendants' tortious interference with Plaintiff's actual and prospective contractual relationships;

    F.    Incidental and consequential damages as permitted by law;

    G.    Punitive damages;

    H.    Attorneys' fees and costs as permitted by law; and

    I.    Such other relief as this Court deems appropriate.

**COUNT V**
Violation of Federal Trade Secrets Act
18 U.S.C. §1836
(Against all Defendants)

152.    Alliance incorporates by reference herein the preceding paragraphs as if fully set forth at length.

153.    The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating Alliances Confidential Information.

154.    This information is confidential and constitutes trade secrets under the law.

155.    This information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

156.    The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating Alliance's confidential trade secret information in violation of 18 U.S.C. §1836.

32

157.    The Defendants acted collectively and concertedly in willfully and maliciously misappropriating Alliance's confidential trade secret information in violation of 18 U.S.C. §1836.

158.    As a direct and proximate result of the Defendants' misappropriation of Alliance's confidential trade secret information, Plaintiff has been, and will continue to be, irreparably harmed.

159.    As a direct and proximate result of the Defendants' misappropriation of Alliance's confidential trade secret information, Plaintiff has suffered, and will continue to incur, monetary damages.

160.    Defendants' misappropriation of Alliance's confidential trade secret information was sufficiently wanton, willful and reckless as to justify an award of punitive damages.

WHEREFORE, Alliance Life Sciences demands judgment in its favor and against Fabriczi and IMS as follows:

A.    An injunction effective immediately and for one year from the date of judgment, prohibiting Fabriczi, directly or indirectly, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.    Continuing in the employment of IMS or providing any services to IMS in any other business-related capacity;

2.    Working for, assisting, engaging in or having a financial interest in any business operation within 75 miles of the Alliance's offices which engages, in whole or in part, in information technology consulting and/or business consulting services, including by means of example but not limited to, strategic development, design, programming, implementation, staffing and/or support services; and

33

3.     (i) Inducing or attempting to induce any employee or independent

contractor of Alliance to terminate his or her employment or other relationship with Alliance, (ii)

hiring any employee or independent contractor employed or engaged by Alliance during the two-

year period of time preceding Fabriczi's termination date; (iii) diverting or soliciting business

from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or (iv) cause

or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain from doing

business with Alliance or adversely affect the business they do or plan to do with or give to

Alliance (as those terms are defined in the Fabriczi Employment Agreement);

B.     A permanent injunction effective immediately prohibiting Fabriczi or IMS,

directly or indirectly, for their own benefit or the benefit of any other person or entity, directly or

indirectly, in any capacity, whether alone or in concert with others, from disclosing,

communicating, divulging or using, for the direct or indirect benefit of any person, firm,

association or company, other than Alliance, any Confidential Information (as defined in the

Fabriczi Employment Agreement), and requiring Fabriczi and IMS to immediately return all

Confidential Information in their possession or control;

C.     An injunction effective immediately and for one year from the date of judgment,

prohibiting IMS, directly or indirectly, for its own benefit or the benefit of any other person or

entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.     Employing, consulting with, or receiving the services of Fabriczi or

Alcorn;

2.     Using, disclosing, or receiving, for any purpose, any Confidential

Information of Alliance (as that term is defined in the Fabriczi Employment Agreement);

34

3.      Diverting any business, or soliciting or accepting competitive business from any Current, Former or Future Customer(s)/Client(s) of Alliance Life Sciences or its predecessors and/or affiliates, as those terms are defined in the Fabriczi Employment Agreement;

4.      Inducing or attempting to induce any employee or independent contractor of Alliance Life Sciences or its affiliates, to terminate his or her employment or other relationship with Alliance; and

5.      Hiring any employee or independent contractor employed or engaged by Alliance Life Sciences, or its predecessors and/or affiliates in the one (1) year preceding Fabriczi's termination of employment.

D.      A permanent injunction requiring IMS to immediately return to Alliance Life Sciences any and all Confidential Information and copies thereof, and/or any other property of Alliance Life Sciences, whether electronic or otherwise, that it has in his possession, custody or control.

E.      Monetary damages that Alliance Life Sciences is entitled to recover as a result of the Defendants' tortious interference with Plaintiff's actual and prospective contractual relationships;

F.      Incidental and consequential damages as permitted by law;

G.      Punitive damages;

H.      Attorneys' fees and costs as permitted by law; and

I.      Such other relief as this Court deems appropriate.

35

COUNT VI
Violation of Pennsylvania Trade Secrets Act
12 Pa.C.S. §§5302, *et seq.*
(Against all Defendants)

161.    Alliance incorporates by reference herein the preceding paragraphs as if fully set forth at length.

162.    The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating Alliance's Confidential Information.

163.    This information is confidential and constitutes trade secrets under the law.

164.    The Defendants knew or had reason to know that they acquired these trades secret by improper means.

165.    The Defendants, at the time they disclosed or used these trade secrets, knew or had reason to know that they had been acquired by improper means.

166.    The Defendants, at the time they disclosed or used these trade secrets, knew or had reason to know that they had been acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

167.    The Defendants, at the time they disclosed or used these trade secrets, knew or had reason to know that they were derived from or through a person who owed a duty to Alliance maintain their secrecy or limit their use.

The Defendants acted collectively and concertedly, and without authorization or privilege, in misappropriating Alliance's confidential trade secret information in violation of 12 Pa. C.S. §5302, *et seq.*

168.    The Defendants acted collectively and concertedly in willfully and maliciously misappropriating Alliance's confidential trade secret information in violation of 12 Pa. C.S. §5302, *et seq.*

36

169.   The Defendants' acts in misappropriating these trade secrets were intentional and in gross neglect of their duties.

170.   The Defendants' acts in misappropriating these trade secret evince a reckless indifference of the rights of Alliance, and an entire want of care so as to raise the presumption that the Defendants were conscious of the consequences of their carelessness.

171.   As a direct and proximate result of the Defendants' misappropriation of Alliance's confidential trade secret information, MDC has incurred, and will continue to incur, monetary damages.

172.   As a direct and proximate result of the Defendants' misappropriation of Alliance's confidential trade secret information, MDC has incurred, and will continue to incur, irreparable harm.

173.   Defendants' misappropriation of Alliance's confidential trade secret information was sufficiently wanton, willful and reckless as to justify an award of punitive damages.

WHEREFORE, Alliance Life Sciences demands judgment in its favor and against Fabriczi and IMS as follows:

A.   An injunction effective immediately and for one year from the date of judgment, prohibiting Fabriczi, directly or indirectly, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

1.   Continuing in the employment of IMS or providing any services to IMS in any other business-related capacity;

2.   Working for, assisting, engaging in or having a financial interest in any business operation within 75 miles of the Alliance's offices which engages, in whole or in part, in information technology consulting and/or business consulting services, including by means of

37

example but not limited to, strategic development, design, programming, implementation, staffing and/or support services; and

        3.      (i) Inducing or attempting to induce any employee or independent contractor of Alliance to terminate his or her employment or other relationship with Alliance, (ii) hiring any employee or independent contractor employed or engaged by Alliance during the two-year period of time preceding Fabriczi's termination date; (iii) diverting or soliciting business from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or (iv) cause or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain from doing business with Alliance or adversely affect the business they do or plan to do with or give to Alliance (as those terms are defined in the Fabriczi Employment Agreement);

        B.      A permanent injunction effective immediately prohibiting Fabriczi or IMS, directly or indirectly, for their own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from disclosing, communicating, divulging or using, for the direct or indirect benefit of any person, firm, association or company, other than Alliance, any Confidential Information (as defined in the Fabriczi Employment Agreement), and requiring Fabriczi and IMS to immediately return all Confidential Information in their possession or control;

        C.      An injunction effective immediately and for one year from the date of judgment, prohibiting IMS, directly or indirectly, for its own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity, whether alone or in concert with others, from:

        1.      Employing, consulting with, or receiving the services of Fabriczi or Alcorn;

2.      Using, disclosing, or receiving, for any purpose, any Confidential Information of Alliance (as that term is defined in the Fabriczi Employment Agreement);

3.      Diverting any business, or soliciting or accepting competitive business from any Current, Former or Future Customer(s)/Client(s) of Alliance Life Sciences or its predecessors and/or affiliates, as those terms are defined in the Fabriczi Employment Agreement;

4.      Inducing or attempting to induce any employee or independent contractor of Alliance Life Sciences or its affiliates, to terminate his or her employment or other relationship with Alliance; and

5.      Hiring any employee or independent contractor employed or engaged by Alliance Life Sciences, or its predecessors and/or affiliates in the one (1) year preceding Fabriczi's termination of employment.

D.      A permanent injunction requiring IMS to immediately return to Alliance Life Sciences any and all Confidential Information and copies thereof, and/or any other property of Alliance Life Sciences, whether electronic or otherwise, that it has in his possession, custody or control.

E.      Monetary damages that Alliance Life Sciences is entitled to recover as a result of the Defendants' tortious interference with Plaintiff's actual and prospective contractual relationships;

F.      Incidental and consequential damages as permitted by law;

G.      Punitive damages;

H.      Attorneys' fees and costs as permitted by law; and

I.      Such other relief as this Court deems appropriate.

39

**Jacobs Law Group, PC**

Dated: February 15, 2017

*/s/Richard Miller*
Richard E. Miller (I.D. No. 46451)
Samuel M. First (I.D. No. 66176)
2005 Market Street
Suite 1120
Philadelphia, PA 19107
215-569-9701
Attorneys for Plaintiff

Of Counsel:

**GREY STREET LEGAL, LLC**
Janeen Olsen Dougherty (I.D. No. 65883)
356 N. Pottstown Pike, Suite 200
Exton, Pennsylvania 19341
(610) 594-4737

40

Case ID: 170203536
Control No · 17022141

|  |  |
|---|---|
| ALLIANCE LIFE SCIENCES CONSULTING GROUP, INC., | COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY |
| Plaintiff | FEBRUARY TERM 2017 |
| v. | No.: _____ |
| LASZLO FABRICZI, et al., |  |
| Defendants |  |

## VERIFICATION OF ALAN CROWTHER

I, Alan Crowther, am the Chief Executive Officer of Alliance Life Sciences Consulting

Group, Inc., and am authorized to make this Verification on behalf of the Plaintiff. The factual

statements made herein are true and correct to the best of my knowledge, information and belief.

I understand that the statements in this Verification are made subject to the penalties of 18 Pa.

C.S.A. §4904 relating to unsworn falsification to authorities.

Dated: February 15, 2017

_____
Alan Crowther, Chief Executive Officer
Alliance Life Sciences Consulting Group, Inc.

41

Case ID: 170203536
Control No.: 17022141

# Exhibit A

Case ID: 170203536
Control No : 17022141

EMPLOYMENT AGREEMENT

THIS AGREEMENT, made as of this 7th day of July, 2008 by and between Alliance Life Sciences Consulting Group, Inc., a Delaware corporation (hereinafter called the "Company"), and Laszlo Frabriczi, an individual (hereinafter called the "Employee").

## W I T N E S S E T H:

The Company wishes to employ the Employee and the Employee wishes to enter into the employ of the Company on the terms and conditions contained in this Agreement.

WHEREAS, the Employee was previously employed by Alliance Consulting Group Associates, Inc., under an employment agreement dated as of December 29, 2006 ("Prior Employment Agreement");

WHEREAS, the Company is a successor to the Life Sciences business previously conducted by the Prior Employer and with respect to which the Employee was employed;

WHEREAS, the Company and the Employee intend that the Company succeed the Prior Employer as the Employee's employer, and that this Agreement supersede the Prior Employment Agreement;

WHEREAS, prior to entering into this written Agreement, the Company and the Employee agreed to certain terms and conditions, including the Employee's agreement to sign an Employment Agreement with a restrictive covenant and a confidentiality provision;

WHEREAS, the Company is an IT Consulting firm that delivers business driven solutions and domain expertise, as well as technical staffing and recruiting services;

WHEREAS, the Company believes that it will benefit from the Employee's particular and unique skills, experience and background;

WHEREAS, prior to entering into this written Agreement, the Company and the Employee agreed to certain terms and conditions, including the Employee's agreement to sign an Employment Agreement with a restrictive covenant and a confidentiality provision;

NOW, THEREFORE, in consideration of the facts, mutual promises and covenants contained herein and intending to be legally bound hereby, the Company and the Employee agree as follows:

1.    Definitions.  As used herein, the following terms shall have the meanings set forth below unless the contexts otherwise require:

(a)  "Base Compensation" shall mean the annual rate of salary set forth in Section 4(a) herein.

(b)  "Business" shall mean the business conducted by the Company on the date of execution of this Agreement, including business activities under investigation or in developmental stages, all other business activities which flow there from by a reasonable expansion of the present activities of the Company, all business activities which may be developed by the Company during the period of the Employee's employment by the Company, and all business activities now conducted by any affiliate of the Company or which may be developed by such affiliates, during such period as reasonable expansions

*Laszlo Fabriczi Employment Agreement 7-7-08*
DSB:383931.1                                    -1-

Case ID: 170203536
Control No : 17022141

of their present activities. The Company, in very general terms, currently provides information technology and business consulting services on a time and materials or fixed price basis. These services include, but are not limited to service involving strategy, development, integration and/or support, and include staffing services.

(c) "Cause" (for purposes of this Agreement only) is defined to include, but not be limited to a good faith determination by the Company that the Employee has engaged in any of the following:

    (i) the willful failure or refusal to carry out the reasonable directions of the Employee's supervisor;

    (ii) performance in an incompetent manner;

    (iii) gross negligence;

    (iv) violation of any express Company rule, regulation, policy or plan;

    (v) violation of any term of this Agreement;

    (vi) actions contrary to the best interests of the Company, including appropriation of a business opportunity;

    (vii) indictment for a felony;

    (viii) use of alcohol or any substance to the extent it interferes with performance of Employee's duties;

    (ix) unethical business practices;

    (x) theft or destruction of Company property;

    (xi) falsification of Company records; and

    (xii) excessive absenteeism.

        The Company's good faith determination, based on reasonable evaluation, that "Cause" exists for termination of the employment relationship under this provision shall be conclusive for the purposes of this section. Neither the later discovery of additional or different facts tending to negate the Company's determination of "Cause" nor any subsequent finding by any other fact finder that the employee did not in fact engage in conduct identified in this definition of "Cause" shall alter the finality of the Company's determination for the purposes of this Agreement

(d) "Confidential Information" shall have the meaning specified in Section 9(b) hereof.

(e) "Disability" or "Disabled" shall mean the Employee's inability, for a period of twelve (12) consecutive weeks, to perform any of the essential duties of the Employee's position, with or without any reasonable accommodation required by law, due to a mental or physical impairment which substantially limits one or more major life activities. Due to the nature of the Employee's position, the Employee acknowledges that it would be an undue hardship on the Company if the time periods specified in the preceding sentence were longer.

(f) "Work Product" means any and all tangible materials resulting from services to the Company and all ideas, inventions, improvements, discoveries, know-how, techniques and works of authorship (including but not limited to computer programs, software, logic design and documentation) and other information and materials, whether or not patentable, copyrightable or otherwise registrable under applicable statutes, that the Employee may make, conceive, reduce to practice, develop, learn or work on, either alone or jointly with others, whether or not reduced to drawings, written description, documentation, models or other tangible form during the period of employment by the Company.

        2.    At Will Employment. The Company hereby succeeds the Prior Employer as the Employee's employer pursuant to the terms and conditions of this Agreement, which supersede the Prior Employment Agreement. The Employee agrees and acknowledges that the Employee's transfer of employment to the Company shall not be treated as a termination of employment for any purpose under

*Laszlo Fabriczki Employment Agreement 7-7-08*
DSB:383931.1                                                    -2-

the Prior Employment Agreement or this Agreement. The Company hereby employs the Employee and the Employee hereby accepts employment by the Company upon the terms and conditions specified in this Agreement. The Employee's employment is at will and, therefore, may be terminated by the Company at any time for any or no reason whatsoever with or without prior notice and the Employee may terminate his employment at any time for any or no reason whatsoever.

3. Office and Duties

(a) The Employee will be employed as Engagement Manager of the Company and will perform the duties of such a position as assigned by and under the direction of such officers of the Company as they may designate from time to time. The Employee's duties shall include, but not be limited to: (a) management and development of personnel in the Company's business area for which Employee is responsible; (b) management and development of relationships with clients and potential clients; (c) the growth and profitability of the Company's business area for which Employee is responsible; and (d) other areas of responsibility with respect to representation of the Company. Employee's primary place of employment will be Company's office located in Bridgewater, New Jersey.

(b) So long as the Employee shall remain an employee of the Company, the Employee's entire working time, energy, skill and best efforts shall be devoted to the performance of his duties hereunder in a manner which will faithfully and diligently further the business and interests of the Company. The Employee may engage in charitable, civic, fraternal and trade/ professional association activities that do not interfere with the Employee's obligations to the Company, but the Employee shall not work for any other for-profit business, unless given express written authorization from the Company to do so.

(c) The Employee is not permitted or authorized to make or incur any liabilities on behalf of the Company or to otherwise obligate the Company in any manner whatsoever, unless expressly authorized by the Company in accordance with specific guidelines.

4. Compensation. For all of the service rendered by the Employee to the Company, the Employee shall receive, while employed by the Company:

(a) The gross salary of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Base Compensation") per year, less taxes and other deductions required by law. This Base Compensation will be payable in installments in accordance with Company's regular payroll practices in effect from time to time during Employee's employment.

(b) Additionally, Employee will be eligible for a potential ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ annual bonus for attaining 100% of objectives. Objectives will be established, measured, and paid in accordance with Company practice in effect at that time.

(c ) Stock Options. Concurrently with the execution and delivery of this Agreement by the Employee, the Company will also recommend to the Board of Directors that Employee be offered an option to purchase ▮▮▮▮▮ shares of the Company common stock, at the current strike price. Such option shall vest 25% on the first anniversary of this Agreement, and in 36 equal monthly increments each month thereafter, subject to continued employment, and have a term of at least eight years, and shall be subject to such other terms and conditions as shall be set forth in a stock option agreement to be entered into between the Company and the Employee. Option grant is contingent upon final approval of the Board of the Directors.

Case ID: 170203536
Control No : 17022141

(d) Acceleration on Change of Control. Upon a Change of Control vesting of the stock options shall accelerate such that immediately prior to the Change of Control, the stock options shall be vested as to at least twenty-five percent (25%) of the total number of shares subject to the stock options.

### 5. Fringe Benefits

(a) The Company will reimburse the Employee for all reasonable and necessary expenses incurred by the Employee in connection with the performance of the Employee's duties hereunder upon receipt of documentation therefor in accordance with the Company's regular reimbursement procedures and practices in effect from time to time. The Company, from time to time, may require prior approval for individual expense items in excess of pre-established aggregate amounts for a fixed period or in excess of pre-established amounts for any type of expenditure during any fixed period.

(b) The Employee shall be eligible to participate in any medical, dental, life, accident or disability insurance, retirement plan(s) or other benefit plans or programs, if any, made available to other similarly situated employees of the Company, as long as the plans and/or programs are kept in force by the Company and provided that the Employee meets the eligibility requirements and other terms, conditions and restrictions of the respective plans and programs. The Employee acknowledges and agrees that the Company does not promise to institute or maintain any such plans, programs or benefits.

(c) The Employee shall be entitled to paid holidays in accordance with the Company's holiday policy as such policy may exist from time to time. All such time must be used in the calendar year it is advanced to the Employee or such time will be forfeited as of the first day of the new calendar year. Upon separation of employment from the Company, any unused holiday pay will be forfeited and pay for paid time off will be handled in accordance with Section 7(e).

(d) The Employee shall be entitled to 15 days paid time off (PTO) during each calendar year. The Employee shall take paid time off at such time or times as shall be approved by the Company, which approval shall not be unreasonably withheld. All paid time off must be used in the calendar year for which it is advanced. Any unused time will be forfeited as of the first day of the new calendar year. Upon separation from employment from the Company, for any or no reason, subject to Section 7, whether by the Employee or the Company, accrued but unused paid time off will be paid in accordance with the Company's Employee Handbook.

The Company may withhold applicable taxes and other required and requested deductions from all payments and benefits provided hereunder.

### 6. Termination.

(a) The Employee's employment hereunder shall terminate immediately upon his death.

(b) The Company or Employee may terminate the Employee's employment if he is Disabled as defined in Section 1(e). While the Employee is employed during any periods of the Employee's inability to work due to the Employee's Disability, the Employee will be eligible to receive his Base Compensation provided that the Employee (i) first takes all of his unused paid time off and (ii) provides the Company with medical certification, whenever the Company reasonably requests, confirming his inability to work on the specific day(s) of his absence.

(c) Either the Company or the Employee may terminate the Employee's employment with or without Cause at any time, with or without notice.

Case ID: 170203536
Control No : 17022141

(d) Termination of the Employee's employment pursuant to this Section 6 shall release the Company of all its liabilities and obligations under this Agreement, except as otherwise expressly provided herein. Termination of the Employee's employment pursuant to this Section 6 shall not, however, release the Employee from the Employee's obligations and restrictions as stated in Sections 8 and 9 of this Agreement.

(e) The Employee and the Company acknowledge and agree that the Company may require an Employee to whom notice of termination is given to leave the Company premises immediately, and may bar the Employee from unescorted access to the Company premises, so as to enable the Company to secure Company and customer records and preserve Company and customer trade secrets and proprietary information. Upon termination of the Employee's employment for any reason, the Employee shall be deemed to have resigned voluntarily from all offices and other employment positions held with the Company, if the Employee was serving in any such capacities at the time of termination. The Employee will cooperate with the Company in the winding up or transferring to other employees of any pending work or projects. The Employee will also cooperate with the Company in the defense of any action brought by any third party against the Company that relates to Employee's employment with the Company.

7.    Post-Termination Compensation.

(a) If the Employee's employment shall be terminated, the Company shall have no obligation whatsoever to make any further payments or provide any further benefits hereunder for any period subsequent to the date of such termination to the Employee or his surviving spouse, as the case may be, unless otherwise provided in the following provisions of this Section 7.

(b) If the Employee's employment is terminated by reason of the Employee's death or Disability, then the Employee or the Employee's surviving spouse, as the case may be, shall be paid 1 month of the Employee's Base Compensation, at the rate effective on the Employee's termination date, less gross (pretax) amounts, if any, payable to the Employee or the Employee's surviving spouse under the Company-paid insurance, benefit plan or policy under which the Employee was covered at the time of termination, including but not limited to any workers compensation payments and/or any death or disability insurance payments  In the case of workers' compensation or disability insurance payments, the amount to be deducted shall be the amount payable to the Employee during the first  month that such benefits would be payable.  In the case of life insurance payments, the full amount of the payments will be deducted.  If termination is due to death, such payment shall be made in one lump sum within 90 days following the Employee's date of death.  If termination is due to Disability, such payment shall be made in periodic installments in accordance with the then current payroll practices of Company, commencing within 90 days following Employee's termination of employment,

(c) All fringe benefits described in Section 5 will terminate on the last day of the month in which the Employee's employment is terminated, unless stated otherwise within this Agreement or unless the plan documents or insurance contracts require an earlier termination date.  The plan documents or insurance contracts shall govern if there is any conflict between this Agreement and the applicable plan document or insurance contracts.

(d) Except as otherwise provided by applicable law, accrued, but unused paid time off will only be paid to the Employee or the Employee's surviving spouse, as the case may be, if the Employee's termination is wholly a result of the Employee's death or Disability, as outlined in Section 6(a) or (b).


8.    The Company Property.  All advertising, sales, marketing, recruiting and other materials or articles or information, including without limitation data processing reports, computer programs, software, prospective and actual customer/client information and records, consultant,

Case ID: 170203536
Control No : 17022141

independent contractor and employee contact and other information, billing rates, all business records, employee handbook and/or policies, price lists or related information, or any other materials or data of any kind furnished to the Employee by the Company or developed by the Employee on behalf of the Company or at the Company's direction or for the Company's use or otherwise in connection with the Employee's employment (whether or not the information contained therein is deemed confidential), are and shall remain the sole property of the Company, including in each case all copies thereof in any medium, including computer tapes and other forms of information storage. If the Company requests the return of such materials at any time during or at or after the termination of the Employee's employment, the Employee shall deliver all such materials immediately, retaining no copies, of the same to the Company.

### 9. Non-Competition, Confidentiality and Assignment of Inventions.

(a) Non-solicitation. For so long as the Executive shall be employed by the Company and for a period of one (1) year thereafter, the Executive shall not, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity (as an employee, officer, director, shareholder, partner, agent, principal, independent contractor, owner or otherwise) (i) induce or attempt to induce any employee or independent contractor of the Company to terminate his or her employment or other relationship with the Company, (ii) hire any employee or independent contractor employed or engaged by the Company during the two-year period of time preceding the Employee's termination date; (iii) divert or solicit business from or with any Current, Former or Future Customer(s)/ Client(s) of the Company; or (iv) cause or attempt to cause any Current, Former or Future Customer(s)/Client(s) to refrain from doing business with the Company or adversely affect the business they do or plan to do with or give to the Company  The term "Current Customer(s)/Client(s)" means any entity for whom Company was providing services or with whom it had an active contract or engagement as of Executive's date of termination.  The term "Former Customer(s)/Client(s)" means all entities for whom Company provided services or with whom it had an active contract or engagement at any time within the one (1) year period immediately preceding the date of Executive's termination.  The term "Future Customer(s)/Client(s)" means any entity with whom Company had substantive conversations about a potential engagement prior to the date of Executive's termination, and who was still actively considering such engagement as of the date of Executive's termination.

(b) Non-compete. For so long as Employee shall be employed by the Company and for a period of one (1) year thereafter, the Employee shall not, for his own benefit or the benefit of any other person or entity, directly or indirectly, in any capacity (as an employee, officer, director, shareholder, partner, agent, principal, independent contractor, owner or otherwise) engage in or be financially interested in any business operation which engages in whole or in part, in information technology consulting and/or business consulting services either on a time and materials, project or fixed price basis, including by means of example but not limited to strategic development, design, programming, implementation, staffing and/or support services within 75 miles of the Company's office in Bridgewater, New Jersey or any other Company office where Employee has had material involvement with the Company's business, clients or affairs during the one (1) year immediately preceding the termination of the Employee's employment (regardless of whether terminated by the Company or by Employee).  Notwithstanding anything stated in this section 9(b), if Employee is terminated without Cause within the first year of employment, the Noncompete period will be six (6) months after termination and if the Employee is terminated without Cause after the first year of employment, the Non-compete period will be twelve (12) months after termination.

(c) Confidentiality. During the Employee's employment and at all times thereafter, the Employee shall not use for the Employee's personal benefit, or disclose, communicate or divulge to, or use for the direct

Case ID: 170203536
Control No : 17022141

or indirect benefit of any person, firm, association or company, other than the Company, any confidential information and/or proprietary information (collectively "Confidential Information") which the Employee acquires in the course of her employment which is not otherwise lawfully known by and readily available to the general public. This Confidential Information includes, but is not limited to: any information regarding the Company's business methods, policies, procedures or techniques; pricing information and strategy; customer purchasing, contracting and leasing needs; inventions, including discoveries, improvements or ideas, whether potential or not; research, marketing or development projects, results or studies; financial controls, methods of development bids, estimates, direct and indirect costs; employee compensation information; trade secrets or other knowledge or processes of or developed by the Company; any names and addresses of employees, suppliers, customers or clients; any data on or relating to past, present or prospective customers or clients and any other confidential information relating to or dealing with the business operations or activities of the Company, made known to the Employee or learned or acquired by the Employee while in the employ of the Company. Notwithstanding anything to the contrary above, Confidential Information shall not include any information that (i) can be demonstrated as having been known to Employee prior to his hire by Company, or (ii) is or becomes generally available to the public other than as a result of a disclosure by Employee.

(d)  Assignment of Inventions.

(i)  The Employee agrees that the Company and its assigns will be the exclusive owner of Work Product and all patents, trademarks, copyrights, mask works, moral rights and other statutory or common law protections in any and all countries ("IP Rights") covering or otherwise associated with his Work Product. In addition, to the extent the Company has not obtained exclusive ownership due to the Employee's employment, the Employee agrees to, and does hereby, assign to the Company and waive any and all IP Rights in Work Product without further compensation or consideration.

(ii)  However, Section 9(d)(i) does not apply to any invention that the Employee develops entirely on his own time and to which all of the following apply: (a) no equipment, supplies, facilities or trade secret information of the Company are used, (b) it is not related to the Company's business or the Company's actual or demonstrably anticipated research and development, and (c) it does not result from any work performed by the Employee for the Company. In addition, Section 9 (d)(i) does not apply to any inventions which the Employee made or conceived or first reduced to practice alone or jointly with others prior to engagement by the Company. The Employee represents he or she has previously identified to the Company, or identifies herewith, all inventions he desires to have specifically excluded from his obligations under this Section. All of these Section 9(d)(i) inventions are referred to as "Excluded Inventions."

(iii)  If the Employee incorporates any Excluded Invention into any Company product or service or otherwise use an Excluded Invention for the Company's benefit as part of his or her employment activities, the Company is hereby granted and shall have a fully paid, nonexclusive, royalty-free, irrevocable, perpetual, worldwide, transferable and sub-licensable license to make, have made, modify, create derivative works, reproduce, use, offer to sell, sell, import and distribute such Excluded Invention (as may be improved or enhanced by or for the Company) and any Company product or Company service incorporating such Excluded Invention.

(iv)  The Employee agrees to keep, and make available to the Company on demand, equate and current written records of all Work Product. The Employee agrees that these records, and all other information and documents coming into his possession or kept by him in connection with his employment, are the sole property of the Company. The Employee agrees to return to all originals and copies of all such documents to the Company promptly upon termination of his employment.

Case ID: 170203536
Control No : 17022141

(v) The Employee agrees to promptly disclose to the Company all Work Product other than Excluded Inventions. In addition, the Employee agrees that, if requested by the Company, he will disclose in confidence any inventions that he considers to be Excluded Inventions so that the ownership of such inventions can be established.

(vi) The Employee agrees to assist the Company in every reasonable way (such as by signing documents and giving evidence and testimony) to establish the Company's ownership of and other rights in all Work Product and related IP Rights (other than Excluded Inventions) in any and all countries. If he or she is unavailable for any reason, he hereby appoints the Company as his agent and attorneys-in-fact to execute and file any document(s) and to do all other acts to further the prosecution, issuance, enforcement and maintenance of IP Rights in the Work Product other than Excluded Inventions. The Employee's obligations under this Section will extend beyond the termination of his or her employment provided that the Company will compensate him at a reasonable rate after such termination for time or expenses actually spent at the Company's request.

(e) The Employee acknowledges that the restrictions and covenants contained in Sections 8 and 9, in view of the nature of the Business in which the Company is engaged and the Employee's position with the Company, are reasonable and necessary in order to protect the legitimate interests of the Company, that their enforcement will not impose a hardship on the Employee or significantly impair his ability to earn a livelihood, and that any violation thereof would result in irreparable injuries to the Company, and the Employee therefore acknowledges that in the event of his violation of any of these restrictions, the Company shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief, as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such violation and/or to enforce a specific performance thereof by the Employee, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled.

(f) The Employee agrees that if any or any portion of the foregoing restrictions and/or covenants, or the application thereof is construed to be invalid or unenforceable by a court of competent jurisdiction, the remainder of such restriction(s) or covenant(s) or the application thereof shall not be affected and the remaining restriction(s) or covenant(s) will then be given full force and effect without regard to the invalid or unenforceable portions. If any covenant is held to be unenforceable because of the area covered, the duration thereof, or the scope thereof, the Employee agrees that the Court making such determination shall have the power to modify the area and/or the duration, and/or limit the scope thereof, and the covenant shall then be enforceable in its modified form. If the Employee violates any of the restrictions contained above, the period of such violation (from the commencement of any such violation until such time as such violation shall be cured by the Employee to the satisfaction of the Company) shall not count toward or be included in the restrictions contained in the subsections above.

(g) The provisions set forth in Section 8 and Section 9 of this Employment Agreement shall survive the termination of the Employee's employment.

(h) The Employee agrees and acknowledges that his employment and the compensation outlined in Section 4 is full, adequate and sufficient consideration for the restrictions and obligations set forth in Sections 8 and 9 of this Agreement and that, but for the Employee's agreement to such restrictions and obligations, the Company would not engage him as an employee or otherwise.

10. Prior Agreements and Conflicts of Interest. The Employee represents to the Company that: (a) there are no restrictions, agreements or understandings, oral or written, to which the Employee is a party or by which the Employee is bound that prevent or make unlawful the Employee's execution or performance of this Agreement; (b) none of the information supplied by the Employee to the

Case ID: 170203536
Control No : 17022141