**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALLIANCE LIFE SCIENCES** | : | **CIVIL ACTION** |
| **CONSULTING GROUP, INC.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 17-864-CDJ** |
| | : | |
| **LASZLO FABRICZI, and** | : | |
| **QUINTILES IMS, formerly known as** | : | |
| **IMS HEALTH,** | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **August 17, 2017**

Plaintiff Alliance Life Sciences Consulting Group, Inc. ("Alliance") sues its former employee, Defendant Laszlo Fabriczi, and his present employer, Defendant Quintiles IMS Incorporated ("IMS"), for breach of employment contract and unfair competition, seeking money damages and injunctive relief.[1]  Am. Compl. (ECF 13).  Jurisdiction is federal question, 28 U.S.C. § 1331, by referral under 28 U.S.C. § 636(b)(1)(B).  Order, dated Mar. 3, 2017 (ECF 7).

Presently, Plaintiff Alliance moves for a preliminary injunction.  Pl. Mot. (ECF 6).  The request for injunctive relief is based on the assertion that Alliance and Defendant Fabriczi entered into an employment Agreement, dated July 7, 2008, which after termination of his employment with Alliance on October 24, 2016, restricts his solicitation of Alliance's customers and employees, his opportunities to work for Alliance's competitors, and his disclosure of

---

[1]  The Amended Complaint in Count I asserts breach of contract solely against Fabriczi. The remaining claims are asserted against both IMS and Fabriczi:  Count II asserts conspiracy, and aiding and abetting tortious conduct; Count III asserts tortious interference with current and prospective contractual relations; Count IV asserts unfair competition; Count V asserts violation of the Federal Trade Secrets Act, 18 U.S.C. § 1836; and Count VI asserts violation of Pennsylvania's Trade Secrets Act, 12 Pa.C.S. § 5302, et seq.

Alliance's confidential, proprietary, and trade secret information.[2]  The gravamen of the request for injunctive relief is that Fabriczi is breaching the restrictive covenants by working for Defendant IMS, a direct competitor of Alliance, and by providing information technology services to Johnson & Johnson Health Care Systems ("JJHCS"), a client of Alliance as well as IMS.  IMS is faulted for employing Fabriczi on its project for JJHCS, and for acting in concert with Fabriczi to interfere with Alliance's present and prospective customer relationships.  Alliance moves for a preliminary injunction to enforce the 2008 Agreement and enjoin Fabriczi from working for IMS, and enjoin IMS from employing Fabriczi, on IMS's project for JJHCS.  IMS and Fabriczi oppose the motion, asserting that Alliance's claims fail on their merits and regardless of the merits, the record does not support a grant of the extraordinary injunctive remedies requested here.  Defs. Resp. (ECF 15, 17, 41, 42).

Considering the present record, there is an insufficient basis upon which a finding of immediate or threatened irreparable injury can be made to support the requested preliminary injunction.  As follows, the assertions of Alliance, even if assumed to be true for purposes of the present motion, do not constitute irreparable injury.  Alliance has an adequate remedy at law, in this case money damages.

---

[2]  The Amended Complaint asserts that in 2006, Fabriczi signed an employment agreement when he joined Alliance's predecessor, Alliance Consulting Group Associates, Inc. ("Alliance Consulting").  Am. Compl. ¶¶ 29, 37 (the "2006 Agreement").  In 2008, Alliance Consulting was restructured to form two separate business entities, one of which is Alliance Life Sciences Consulting Group, Inc. (Plaintiff here, Alliance).  Id. ¶ 38.  Fabriczi became employed by Alliance, and he signed a new employment agreement, dated July 7, 2008 (the "2008 Agreement").  Id. ¶ 38.  The parties hotly dispute the applicability of the Agreement(s), and hotly dispute the parameters of any restrictive covenants.

This Report & Recommendation does not recommend any rulings and does not decide any issues as to the enforceability, interpretation, application, operation, or effect of the 2006 and 2008 Agreements because I conclude that the request for injunctive relief can be decided on other grounds.  The Agreements and their restrictive covenants are discussed herein only to provide the background and context of the present motion for a preliminary injunction.

# I.    PROCEDURAL HISTORY

On February 15, 2017, Plaintiff Alliance filed a Complaint and a petition for preliminary injunction against Defendants Fabriczi and IMS in the Court of Common Pleas of Philadelphia County.  On February 23, 2017, IMS removed the lawsuit to this Court.  Notice of Removal (ECF 1).  Fabriczi joined in the removal.  Joinder (ECF 3).  On March 13, 2017, Alliance amended its pleading.  Am. Compl. (ECF 13).  On March 27, 2017, IMS answered, and asserted affirmative defenses and counterclaims.  IMS Answer (ECF 24).  On April 14, 2017, Alliance moved to dismiss the counterclaims for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6).  Pl. Mot. to Dismiss Counterclaims (ECF 32). On April 28, 2017, IMS amended its counterclaims.  Am. Counterclaims (ECF 34).  On May 18, 2017, Alliance again moved under Rule 12(b)(6) to dismiss the amended counterclaims.  Pl. Mot. to Dismiss Am. Counterclaims (ECF 39).  The dismissal motion remains pending.

On March 2, 2017, Alliance filed the present motion for a preliminary injunction, and IMS and Fabriczi responded.  On May 24 and 25, 2017, an evidentiary hearing was conducted. Hr'g Transcripts (ECF 47, 48, 50 (sealed)).  As directed by the Court, the parties filed proposed Findings of Fact ("FOF") and Conclusions of Law ("COL").  Order, dated June 1, 2017 (ECF 45); Submissions (ECF 49, 51 (sealed)).

Under the Federal Arbitration Act, 9 U.S.C. § 1 et seq., the claims asserted in the Amended Complaint for money damages against Fabriczi and IMS, and a separate request for a permanent injunction against Fabriczi, were referred to arbitration under an enforceable arbitration clause contained in the 2008 Agreement.  Order, dated May 15, 2017 (ECF 38).  The "Arbitrable Claims" are stayed pending arbitration.  Id. at n.1.  The stay "does not affect the

preliminary injunction proceeding." Id. See also Am. Compl. ¶ 14; Def. Mot. to Compel Arbitration & Dismiss Arbitrable Claims (ECF 23); Pl. Resp. (ECF 29).

## II. FINDINGS OF FACT

1.      In 1994, Laszlo Fabriczi graduated from Rutgers University with a degree in computer sciences.  In 1998, he earned a master's degree in information systems from Seton Hall University.  Hr'g Tr., dated May 24, 2017 ("Day 1 Tr."), 196:16–197:12.

2.      In December, 2006, Fabriczi began working for Alliance Consulting Group Associates, Inc. ("Alliance Consulting"), Alliance's predecessor.  Day 1 Tr., 28:17-21.  At that time, he had about 12-14 years of previous job experience in the computer and financial software services industry.  Day 1 Tr., 196:16–204:6; Resume, D–51.[3]  In addition, he had already earned numerous computer technology certifications.  Hr'g Tr., dated May 25, 2017 ("Day 2 Tr."), 150:19–151:12.

3.      Before joining Alliance, Fabriczi worked as a principal consultant for Model N Incorporated, a software company based in Princeton, New Jersey.  Day 1 Tr., 201:17–202:15. He testified that "he originally started as a business analyst within what they call their professional services organization.  And that . . . group primarily focuses on implementing that software for their clients."  Id., 202:8-11.  He was "promoted to the title of principal, which is basically a project manager title that you would consider at a consulting organization."  Id., 202:12-15.  Model N software is used by both Alliance and IMS, and Model N software is an integral part of the work Fabriczi performs presently for IMS.  Id., 203:1-8.

_____

[3] Exhibits admitted at the hearing are identified numerically as Plaintiff's exhibits, "P–1, P–2," etc. and Defendants' exhibits, "D–1, D–2," etc.

4.	In 2008, Alliance Consulting was divided into two separate business entities: Alliance Life Sciences Consulting Group, Inc. (the Plaintiff here, Alliance) and Alliance Global Services.  Day 1 Tr., 30:16–31:1.

5.	Alliance provides "software data and business and technology consulting" services.  Day 1 Tr., 27:22–28:6.  Alliance's business focuses on "commercial contracting and other commercial pricing and business service problems for our life science customers, which are pharmaceutical, medical device, and other healthcare manufacturers."  Id.

6.	In connection with the formation of Alliance, Fabriczi was asked to sign a new employment agreement, and he signed it during July, 2008.  Day 1 Tr., 174:10–175:6; the 2008 Agreement, P–2 & D–7.  See footnote 2, supra (the 2006 and 2008 employment Agreements).

7.	The 2006 and the 2008 employment Agreements contain covenants that restrict Fabriczi's solicitation of Alliance's customers and employees, his opportunities to work for Alliance's competitors, and his disclosure of Alliance's confidential, proprietary, and trade secret information.  See, e.g., Am. Compl. ¶¶ 38, 40; the 2008 Agreement, §§ 9(a)–(c), P–2 & D–7.

8.	In 2014, Fabriczi became the practice group leader of Alliance's contract strategy, operations, and compliance ("CSOC") practice group.  Day 1 Tr., 47:6–48:12.  Among other duties, he worked with the sales team to develop business strategies, secure customer accounts, and "pitch" or sell Alliance's services to customers.  Id., 47:11–48:12.  He was also charged with bidding prices, determining work margins, and creating presentations for clients.  Id.  In addition, he was responsible for developing the methods, processes, templates, and strategies to deliver Alliance's services to its clients, and for delivering those services.  Id.

9.	Alan Crowther, Alliance's present president and former CEO serving during the greater portion of Fabriczi's employment, testified that "CSOC is a contract strategy operations

and compliance group . . . that provides business consulting, technology consulting, and business operations services to life sciences manufacturers to help them in all aspects around how they manage their revenue-bearing contracts, the contracts that drive revenue in the company." Day 1 Tr., 46:4-10.

10.     On October 10, 2016, Fabriczi notified Alliance that he was resigning, and his last day at work for Alliance was October 23 or 24, 2016.  Day 1 Tr., 72:2-5, 180:14-16, 182:8-11, 214:18-20.  As of the time of his resignation, his title was executive vice president.  Id., 46:1-2.

11.     In September, 2016, Rosemary Connel, who worked for IMS, sent Fabriczi an email stating in effect that "IMS had some lucrative opportunities that [he] might be interested in."  Day 1 Tr., 228:5-25.  Fabriczi was "still heads down at Alliance," so "there was no reason for [him] to reach out to her."  Id.  During the fall of 2016, Fabriczi decided to leave Alliance. When negotiations for a potential position with Cumberland Consulting Group fell apart, he contacted Connel.  Id., 188:5-22, 228:5–231:10.  IMS recruited Fabriczi, and on December 7, 2016, IMS extended an offer to employ him as Senior Principal of its System Integration Resource Center, based at IMS's office in Plymouth Meeting, Pennsylvania.  Offer, D–43, D–44; Day 2 Tr., 8:11-14, 9:17-18.  IMS hired Fabriczi around December 19, 2016, and he is presently employed by IMS.  Id., 11:6-10.

12.     Crowther testified that Johnson & Johnson Health Care Systems (JJHCS) is one of hundreds of different "legal entities," or business operating companies, within Johnson & Johnson.  Day 1 Tr., 144:17-25.

13.     Emmanuel Doe, Alliance's present CEO and former COO, testified that before August, 2016, JJHCS had not hired Alliance's CSOC group to perform any services.  Day 2 Tr., 42:14–43:2, 49:12–50:5, 50:23–51:5, 102:2-7.  PowerPoint slide, P–4.

14.     Before August, 2016, JJHCS had hired a practice group within Alliance other than the CSOC group, but Fabriczi was not involved in that work.  Day 1 Tr., 122:1–123:24.

15.     Lois Byra, a former colleague of Fabriczi's, worked for Alliance from 2010 until April of 2016, when she became employed by JJHCS.  Defs. Ex. G (ECF 41) & Ex. C (ECF 51), Deposition Transcript of Lois Byra, dated May 5, 2017 ("Byra Dep."), 19:8-13, 26:11-15; Day 1 Tr., 57:9-13, 142:3-8.

16.     In the summer of 2016, Byra asked Alliance to bid on a project for JJHCS that the parties refer to as the "Data Harmonization Project."  Day 1 Tr., 57:4-8.

17.     Byra testified that the Data Harmonization Project was a "prerequisite" for what JJHCS refers to as "Phase II" of its "Commercial Contract Improvement Program"—a program to bring various operating companies within Johnson & Johnson onto a new operating platform using Model N software.  Byra Dep., 11:24–12:16, 25:15-22, 26:2-10, 36:11-22.

18.     In August, 2016, Alliance submitted a bid to JJHCS for the Data Harmonization Project.  Byra Dep., 48:20-24; Day 1 Tr., 56:14–57:3.

19.     Fabriczi participated in the preparation of Alliance's bid for the Data Harmonization Project.  He participated in preparing Alliance's proposal pitching its services to JJHCS and in presenting the proposal to a group that included Byra.  He was listed on the presentation materials as a staffing resource for the project.  Day 1 Tr., 58:8-18, 59:11-19, 140:18–141:8, 178:23-25; Byra Dep., 48:20–50:22.

20.     Alliance's bid for the Data Harmonization Project was not successful.  JJHCS selected another company, High Point Solutions, to perform the work.  Day 1 Tr., 71:7-9; Byra Dep., 52:2–53:15.

21.     Doe acknowledged that the Data Harmonization Project "would be the first project for the CSOC group ever for Alliance to work with JJHCS." Day 2 Tr., 102:2-7. Crowther also acknowledged as much. Day 1 Tr., 143:15–145:11. Fabriczi testified that he was not aware that the CSOC group had ever before done any business with JJHCS. Id., 232:4-24. PowerPoint slide, P–4.

22.     Doe testified that before August, 2016, the CSOC group had not established a business relationship of any kind with JJHCS. Day 2 Tr., 103:18-21.

23.     Neither Alliance's CSOC group nor Fabriczi, during the decade that he was employed by Alliance, performed any services under a formal contract for JJHCS—or for any other entity within Johnson & Johnson. Day 1 Tr., 122:7–123:24, 211:21–212:10.

24.     In August, 2016, JJHCS and IMS began discussing IMS's information technology consulting services for what the parties describe as the "Contract Conversion Project," which is the work that IMS is presently performing for JJHCS. Day 2 Tr., 26:18–27:12, 28:22–29:3. This Contract Conversion Project is part of Johnson & Johnson's overall commercial contract improvement program. Id., 11:2-5.

25.     JJHCS awarded IMS the Contract Conversion Project, and did so before Fabriczi began working for IMS. Day 2 Tr., 30:16–31:8.

26.     There is no evidence that Fabriczi in any way influenced JJHCS's decision to select IMS for the Contract Conversion Project. See Byra Dep., 99:7–100:23, 104:1–105:3, 157:17–159:4 (Connel provided his name to JJHCS as a resource on the Project).

27.     In early December, 2016, JJHCS verbally authorized IMS to begin preparing the statement of work ("SOW") for the Contract Conversion Project. Day 2 Tr., 28:22–29:6.

28.     IMS received JJHCS's verbal notification to begin the SOW for the Contract Conversion Project before Fabriczi began working for IMS.  Day 2 Tr., 29:5-6.

29.     Fabriczi worked for IMS on the SOW for the Contract Conversion Project, beginning in December, 2016.  Day 1 Tr., 191:20–192:4; Day 2 Tr., 11:6-10, 12:19–13.2, 29:5-22.

30.     In late December, 2016, Byra approved IMS's assignment of Fabriczi to the Contract Conversion Project.  Byra Dep., 100:11-23.  Christopher Leibfreid, IMS's practice leader for "manage markets transformation," testified that Byra, on behalf of JJHCS, "requested that he be put on that project."  Day 2 Tr., 6:7-8, 32:9-14.

31.     The work order, or "master services agreement," for the Contract Conversion Project was executed by IMS and JJHCS on January 23 or 24, 2017.  Day 2 Tr., 11:15–12:5, 28:7-21.

32.     The value of the Contract Conversion Project is about $600,000–$700,000.  Day 2 Tr., 27:13-15, 35:17-20, 36:1-5; Byra Dep., 125:13–126:2.

33.     The record is devoid of legally sufficient evidence to show that Alliance will suffer noneconomic, irreparable harm in the absence of an injunction.  This Court concludes that Alliance's evidence of irreparable harm is speculative, as follows, and recommends that Alliance's request for injunctive relief be denied on this basis.

34.     Crowther testified that Johnson & Johnson is currently Alliance's "largest customer," and a "premier customer" that Alliance is "trying to grow our work around the CSOC practice within Johnson & Johnson."  Day 1 Tr., 91:15, 91:24–92:1.

35.     Crowther testified that providing services to Johnson & Johnson was "critical" to Alliance's efforts to increase its customer base and grow its goodwill:  "[B]ut many other

companies make their decisions off of similar large-scale referenced clients. Johnson & Johnson is one of the largest. So this was a critical account that we were seeking work at because of, you know, their reputation and prestige." Day 1 Tr., 92:1-6.

36.     Crowther testified that if Fabriczi is not enjoined from working for IMS on Johnson & Johnson matters, Alliance would suffer losses on "multiple levels," including projected losses of revenue, both present and future, and business opportunities, in a "cascade effect over time." Day 1 Tr., 91:8–92:24.

37.     Specifically, Crowther testified that in the absence of an injunction, "we lose the immediate revenue within the customer," because IMS through Fabriczi—instead of Alliance— is providing services to Johnson & Johnson on a particular project, the Contract Conversion Project. Day 1 Tr., 91:16-17.

38.     Beyond the immediate, present loss of revenue, Crowther testified that Alliance would suffer future losses of revenue should Fabriczi remain on the job for IMS providing services to Johnson & Johnson: "projects grow based on relationships and intimate customer knowledge, and customers at a certain point will stop bringing on new parties to a work stream. They'll say, we have enough parties in here. And those parties will get more and more of that revenue." Day 1 Tr., 91:18-23.

39.     Doe also testified that if Fabriczi is permitted to continue working for IMS on Johnson & Johnson matters, Alliance would suffer "frankly" and "truly" "multi-facetted harm," including loss of business opportunities and loss of goodwill. Day 2 Tr., 74:13–76:14.

40.     Specifically, Doe testified that Alliance would lose Byra as a "beachhead" "to further gain work at JJHCS." Day 2 Tr., 75:6-9. "We believe, as any consulting company, our ability to demonstrate and continue to grow is through the good work of our individuals and our

people and our know-how." Id., 75:9-12. "So we were looking for our people that were immediately placed [at JJHCS] after we lost the data harmonization bid to help out in the contracting area of [JJHCS] to be able to procure this business." Id., 75:23–76:1, 110:22–111:4.

41. Doe testified that since Fabriczi began working with IMS, Alliance is "no longer . . . able to procure additional work there because . . . [JJHCS] feels as though they have enough people to do the work that they need to do." Day 2 Tr., 74:8-12, 76:1-7. Doe's testimony is not supported by personal knowledge of any facts that would evidence the asserted feelings, choices, and decisions of JJHCS.

42. Crowther also testified that since Fabriczi has been employed by IMS, JJHCS "no longer needed additional  . . . companies to work for them . . . and we would not be receiving any further work in that area [CSOC]." Day 1 Tr., 127:6-17. And, he testified, Alliance has not received any CSOC work from JJHCS. Id., 94:25–95:3. Crowther's testimony is also unsupported by personal knowledge of any facts that would evidence the asserted needs, choices, and decisions of JJHCS.

43. Doe testified that "not only are we suffering from a goodwill perspective to build out our business at [JJHCS], but also at many other clients that might have been referenceable clients - - I mean, that might have used [JJHCS] from a referenced perspective as well." Day 2 Tr., 76:8-14.

44. The record does not support Doe's and Crowther's claims concerning JJHCS's lack of desire to work with Alliance. The record is devoid of any competent evidence that JJHCS, or any other operating company within Johnson & Johnson, ceased or threatened to cease doing business with Alliance because of Fabriczi's employment with IMS. Instead, the record

shows that Alliance has forged new business relationships with Johnson & Johnson and JJHCS, as follows.

45.     Crowther testified that after Alliance's unsuccessful bid for JJHCS's Data Harmonization Project, Alliance succeeded in September, 2016, in placing one of its employees, Terry Furlow, "in the contract customer support role within [JJHCS]."  Day 1 Tr., 71:10-15, 123:9-11.  And "[i]t's ongoing work."  Id., 71:17.  Doe acknowledged as much.  Day 2 Tr., 52:6-20.  Neither Alliance's CSOC group nor Fabrizi were involved in placing Furlow, or in separate work "around a unique device identifier," which began in April, 2016.  Day 1 Tr., 123:4-24.

46.     Crowther testified that in September, 2016, three additional Alliance employees were placed in JJHCS.  Day 1 Tr., 123:25–125:7.

47.      Crowther acknowledged that Johnson & Johnson and JJHCS are current customers of Alliance.  Day 1 Tr., 28:8-10, 53:20-24, 54:4-10, 71:18-19.

48.     Crowther testified that Alliance has done work for operating companies within Johnson & Johnson other than JJHCS.  Day 1 Tr., 71:20–72:1.

49.     The present record is devoid of any evidence that Alliance is suffering, or is in imminent danger of suffering, irreparable harm though Fabrizi's disclosure of Alliance's confidential, proprietary, or trade secret information.

50.     Doe, Alliance's Rule 30(b)(6) witness and present CEO, and Crowther, Alliance's president and former CEO, were unable to identify any confidential or proprietary information, or a single trade secret that Fabrizi allegedly took from Alliance and used or is using at IMS.  Day 1 Tr., 52:1–53:1, 92:10-12, 94:17-20, 97:20–98:13, 100:23–101:14, 102:14–103:21 (Crowther).  Day 2 Tr., 48:14–49:11, 85:19–89:18 (Doe).

51.     Crowther testified that Fabriczi had access to Alliance's confidential, proprietary, and trade secret information, and had knowledge of Alliance's internal methods, processes, trade secrets, customers, and the strengths and weaknesses of its employees.  Day 1 Tr., 52:21-25.  In Crowther's words, Fabriczi "had our playbook, our methods, our, you know, knowledge of our processes, our employees, our customers."  Id., 92:11-13.  And as Crowther views the facts, Fabriczi in his work for IMS at JJHCS's site was "in a position" to use that information and knowledge to damage Alliance's relationship with its customers.  Id., 94:17-20.

52.     Doe testified that "it is not about documents."  Day 2 Tr., 85:23-24.  Instead:  "It's about the know-how, the processes, the technologies, which Mr. Fabriczi created for Alliance and developed for Alliance during his long tenure at Alliance."  Id., 85:24–86:2.  "He understood all of our bid processes.  He understood all of our capabilities . . . and our processes for contract conversion and data harmonization and data management."  Id., 86:2-5.

53.     Neither Crowther nor Doe identified any specific confidential, proprietary, or trade secret information that might be threatened or compromised by Fabriczi's work with IMS.  The current record is devoid of any competent, specific evidence to support Crowther's and Doe's fears that IMS's intellectual property might be threatened or compromised.

54.     Fabriczi was asked:  "[H]ave you disclosed any confidential information that belongs to Alliance to anybody, whether from the time that you went to work for Alliance up until today?"  Fabriczi testified:  "No, I did not."  Day 1 Tr., 232:25–233:4.

55.     Fabriczi was asked:  "Have you ever taken any trade secrets that belong to Alliance?"  Fabriczi testified:  "No."  Day 1 Tr., 233:9-11.

## III. LEGAL STANDARD

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" Ferring Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205, 210 (3d Cir. 2014) (quoting Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002) (citation and internal quotation marks omitted)). As recently ruled by our Court of Appeals, a party seeking a preliminary injunction must first demonstrate that:  (1) "it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)," and (2), "it is more likely than not to suffer irreparable harm in the absence of preliminary relief." Reilly v. City of Harrisburg, 858 F.3d 173, 179 & nn.3-4 (3d Cir. 2017); accord Del. River Port Auth. v. Transam. Trailer Transp., Inc., 501 F.2d 917, 919-20 (3d Cir. 1974).  "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." Reilly, 858 at 179. The remaining factors are:  (3) the "possibility of harm to other interested persons from the grant or denial of the injunction," and (4) the "public interest." Transam. Trailer, 501 F.2d at 920.

A movant suing for a preliminary injunction must show more than a "possibility of irreparable harm." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  The movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction." Id. (emphasis in original).  Accord Reilly, 858 F.3d at 179 ("more likely than not"); Ferring Pharm., 765 F.3d at 217 (requiring "a *clear showing*") (emphasis in original).  Showing irreparable harm is a "critical" and "threshold" factor, without which a preliminary injunction cannot be granted. Reilly, 858 F3d at 179.  Accord NutraSweet Co. v. Vit–Mar Enter., Inc., 176 F.3d 151, 153 (3d Cir. 1999) ("A plaintiff's failure to establish any element in its favor renders a preliminary

injunction inappropriate.") (citing <u>Opticians Ass'n of Am. v. Indep. Opticians of Am.</u>, 920 F.2d 187, 192 (3d Cir. 1990)); <u>Rann Pharm., Inc. v. Shree Navdurga LLC</u>, No. 17-1893, 2017 WL 2442975, at *3 (E.D. Pa. June 6, 2017) (Schiller, J.) (denying injunctive relief under <u>Reilly</u> where requirement of irreparable harm was not met); <u>Arkeyo, LLC v. Cummins Allison Corp.</u>, No. 16-4720, 2017 WL 2813224, at *4 (E.D. Pa. June 29, 2017) (Brody, J.) (denying injunctive relief under <u>Reilly</u> where the requirement of a likelihood of success on the merits was not met).

Irreparable injury occurs when money damages are difficult to ascertain or would be inadequate. <u>In re Arthur Treacher's Franchise Litig.</u>, 689 F.2d 1137, 1146 (3d Cir. 1982). However, in order to show irreparable harm, the movant "must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following a trial." <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 801 (3d Cir.), <u>rehr'g denied</u> (Sept. 25, 1989). "The preliminary injunction must be the only way of protecting the plaintiff from harm." <u>Id.</u>

The "availability of money damages for an injury typically will preclude a finding of irreparable harm." <u>Reilly</u>, 858 F.3d at 179 n.4 (citing <u>Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.</u>, 847 F.2d 100, 102 & n.3 (3d Cir. 1988) (finding that "[t]he availability of adequate monetary damages belies a claim of irreparable injury")). And our Court of Appeals has "long held that an injury measured in solely monetary terms cannot constitute irreparable harm." <u>Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.</u>, 562 F.3d 553, 557 (3d Cir. 2009), <u>rev'd in part on other grounds</u>, 676 F.3d 318 (3d Cir. 2012); <u>see also</u> <u>Arthur Treacher's</u>, 689 F.2d at 1145 ("[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law.").

# IV. ANALYSIS AND CONCLUSIONS OF LAW

Despite emphatic pronouncements by our Court of Appeals as to the movant's burden to make a clear showing of irreparable harm supporting a request for extraordinary preliminary injunctive relief, Alliance asserts that the harm ensuing from Fabriczi's and IMS's violations of the restrictive employment covenants is "irreparable as a matter of law." Pl. Br. at 13 (ECF 6-3). Alliance also cites Pennsylvania law to support this position, to no avail. Id.; see also Pl. COL ¶¶ 6, 41 (asserting that "Pennsylvania law is clear that violation of a non-compete agreement results in irreparable harm") (ECF 49). Although the right upon which the claims for breach of employment contract turn is state-created, federal standards govern decision of requests to federal courts for preliminary injunctions. Instant Air Freight, 882 F.2d at 799 & n.4 (citing Sys. Operations, Inc. v. Sci. Games Dev. Corp., 555 F.2d 1131, 1141 (3d Cir. 1977)). Rule 65(a) of the Federal Rules of Civil Procedure codifies "the traditional equity practice" for preliminary injunctions. Id. at 799 n.4. See also Bateman v. Ford Motor Co., 302 F.2d 63, 66 (3d Cir. 1962) (federal courts are authorized under their general equitable powers to give injunctive relief).

Federal standards for granting a preliminary injunction have not been met here. Movant Alliance puts forward only perfunctory assertions of harm, stating that "injury to goodwill and the use of a company's confidential information are the types of injuries which constitute irreparable harm." Pl. COL ¶¶ 42, 45. But a recitation of types of irreparable harm that are often suffered by breach of non-solicitation, noncompetition, or nondisclosure covenants is not a "'clear showing'" of actual or even potential harm. Ferring Pharm., 765 F.3d at 217 (quoting Winter, 555 U.S. at 22). Instead, federal law obligates Alliance to present actual evidence of irreparable harm, which Alliance has not done.

In Alliance's view, it is imperative that the 2008 Agreement's non-solicitation, noncompetition, and nondisclosure covenants be enforced, to protect Alliance's viability as a successful commercial consulting enterprise. In essence, Alliance maintains that in the absence of an injunction, it is losing both present and future customers, revenue, business reputation, business opportunities, and goodwill. Alliance maintains that the asserted harm cannot be adequately redressed by money damages because Alliance is suffering and will suffer indefinite and unascertainable losses on "multiple levels," including projected losses of present and prospective customers, present and future revenue, and contemplated business opportunities, in a "cascade effect over time." Day 1 Tr., 91:8–92:24.

Despite these assertions, the record does not contain any specific evidence making out a clear showing of irreparable harm—not to Alliance's reputation, customer relationships, or goodwill, and not to its confidential, proprietary, or trade secret information. Alliance only speculates that Fabriczi's continued employment with IMS is causing and will cause harm. "Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury,'" Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 205 (3d Cir. 1990) (quoting ECRI v. McGraw–Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (quoting Cont'l Grp., Inc. v. Amoco Chem. Corp., 614 F.2d 351, 359 (3d Cir. 1980)) (citation and internal quotation marks omitted)), or a "presently existing actual threat" of irreparable injury. Cont'l Grp., 614 F.2d at 359 (citation and internal quotation marks omitted). An injunction "may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights." Id. And it is "well-settled law" that injunctions "will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." Id.

Alliance has not identified any lost customers.  The record shows that Johnson & Johnson and in particular, JJHCS are existing customers of Alliance.  Alliance has not specified any decrease in present or future revenue or profits.  Alliance has not offered any financial statements or expert testimony supporting the asserted decrease in present or future income.  Alliance has not identified any particular business opportunities that were foreclosed.  Alliance's evidence comprises solely its own representatives' general predictions and forebodings.

Alliance's representatives, Crowther and Doe, testified that since Fabriczi started working for IMS, Alliance has not received any new CSOC business from JJHCS or any of the other Johnson & Johnson companies.  But that coincidence does not establish a causal relationship between the two events.  There could be other explanations for the lack of business, none of which involve Fabriczi's presence at either IMS or JJHCS.  These general statements are insufficient to support a finding that Fabriczi and IMS caused any harm, let alone irreparable harm to Alliance.

Alliance also maintains that Fabriczi's and IMS's use and disclosure of Alliance's confidential, proprietary, and trade secret information constitutes irreparable harm.  Alliance asserts that Fabriczi must be disclosing protected information in order to perform the kind of work required by IMS's project for JJHCS.  But Alliance only assumes that is so.  Alliance's argument ignores Fabriczi's substantial education, job experience, and certifications—and specifically his job experience, training, and skills with Model N software—all of which were acquired before he started to work for Alliance.  Fabriczi individually cannot be considered an embodiment of Alliance's intellectual property, as seemingly proposed by Alliance.  Moreover, Alliance only fears that Fabriczi might disclose protected information at some indeterminate time in the future.  The record shows that Fabriczi had long and ample access to Alliance's

confidential, proprietary, and trade secret information, and likely learned much in performing his work. But Alliance has not identified any specific information or a single trade secret that might be compromised or threatened. There is no record evidence that Fabriczi through his employment with IMS has used or disclosed any method, process, practice, template, strategy, document of protected information, or trade secret. And Fabriczi's testimony that he has not improperly used or disclosed any information at any time is unrefuted.

The record contains evidence only of potential economic loss that, if it comes to pass, can be redressed by monetary damages. A claim for loss of business alone—whether present or prospective—is a claim for monetary loss that is calculable and can be remedied by monetary damages. See, e.g., Frank's GMC, 847 F.2d at 102-03 (ruling that loss of sales and service customers, and therefore profits is compensable by money damages); Cunningham Lindsey U.S., Inc. v. Bonnani, No. 1:13-CV-2528, 2013 WL 6080189, at *6 (M.D. Pa. Nov. 19, 2013) (ruling that serious reputational harm and potential future losses of customers can be calculated and remedied by money damages at the end of trial); Aetrex Worldwide, Inc. v. Sourcing for You, Limited, No. 13-cv-1943, 2013 WL 1680258, at *7-8 (D.N.J. Apr. 16, 2013) (finding that the asserted loss of customer relationships and goodwill could be remedied by monetary damages); Childers Prods. Co., Inc. v. Baxter, No. 87-8266, 1989 WL 41344, at *7 (E.D. Pa. Apr. 21, 1989) (ruling that economic loss of sales income is not irreparable injury).

It is true that loss of customer relationships and goodwill might in some cases cause irreparable harm, but Alliance has not proven that the damages it asserts are of "'a peculiar nature, so that compensation in money cannot atone for it.'" ECRI, 809 F.2d at 226 (quoting Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977) (citation and internal quotation marks omitted)). In contrast to Alliance's speculative evidence, the record establishes that the value of

IMS's Contract Conversion Project for JJHCS is about $600,000–$700,000. Money damages for loss of that business should be provable at trial with reasonable certainty. Should Alliance prevail at trial as to that Project, proven losses could be calculated and remedied by assessed monetary damages. At this juncture, Alliance has not made a convincing showing of irreparable harm.

Because Alliance has failed to articulate and adduce proof that it is more likely than not to suffer actual immediate or imminent irreparable harm in the absence of a preliminary injunction, there is no need to address whether Alliance has demonstrated a likelihood of success on the merits. Reilly, 858 F.3d at 179; Rann Pharm., 2017 WL 2442975, at *4.


V.      CONCLUSION

Having held an evidentiary hearing and reviewed the parties' submissions and the record evidence, I find that the assertions of Plaintiff Alliance, even if viewed as true, do not constitute irreparable injury warranting the extraordinary remedy of preliminary injunctive relief. Alliance has an adequate remedy at law, in this case money damages.

Therefore, I make the following:

**RECOMMENDATION**

AND NOW, this __17th__ day August, 2017, it is RESPECTFULLY RECOMMENDED

that Plaintiff Alliance's motion for a preliminary injunction be DENIED.

BY THE COURT:


_____/s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE